685 So.2d 210 (1996)
STATE of Louisiana
v.
Jeanne FORET and Rosetta M. Jones.
No. 96-KA-281.
Court of Appeal of Louisiana, Fifth Circuit.
November 14, 1996.
*212 Bruce G. Whittaker, Indigent Defender Board, 24th Judicial District Court, Parish of Jefferson, Gretna, for Defendant/Appellant Jeanne Foret.
Linda Davis-Short, Indigent Defender Board, 24th Judicial District Court, Gretna, for Defendant/Appellant, Rosetta M. Jones.
Jack M. Cappella, Terry M. Boudreaux, Leigh Anne Wall, District Attorney's Office, Gretna, for Plaintiff/Appellee, State of Louisiana.
Before BOWES, DUFRESNE and DALEY, JJ.
BOWES, Judge.
Defendants, Jeanne Foret and Rosetta M. Jones, each appeal their respective convictions of second degree murder.
Both Foret and Jones were originally charged with the first degree murder of Warner Jones, in violation of La. R.S. 14:30. Both defendants initially pled not guilty, but later changed their pleas to not guilty and not guilty by reason of insanity. The state later amended the indictment from first to second degree murder under La. R.S. 14:30.1. Immediately prior to jury selection defendants changed their pleas back to not guilty. Defendants were tried together, after their individual motions to sever were denied.
The matter proceeded to trial before a twelve person jury on the amended charge of second degree murder; at the conclusion of the proceedings, the jury found both defendants guilty as charged as to second degree murder. Subsequently, each defendant was sentenced by the trial court to the mandatory term of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence, with credit for time served. Defendants thereafter filed motions for appeal.

FACTS

EVIDENCE AND TRIAL TESTIMONY
In the early morning hours of May 3, 1993, the Jefferson Parish Sheriff's Office responded to the call of a suspected burglary with shots fired on Fir Court in Marrero. Upon his arrival, Deputy Richard Folse of the patrol division spoke to Rosetta Jones, who was at a neighbor's house.[1] Deputy Folse learned from defendant, Mrs. Jones, that somebody had broken into her house, that she heard her husband scream, and that she heard shots fired. Deputy Folse advised headquarters of the situation and then proceeded inside the residence with another officer.
Upon entry into the house, they observed the victim, Warner Jones, the husband of defendant Rosetta Jones, lying on the bed in the front bedroom with multiple gunshot wounds to the chest. The officer also observed indentations on the sheet, like shoe imprints, with some mud smears and grass stains. After they found the subject, who appeared to already be deceased, the officers continued to search the house for a possible *213 perpetrator, but found none. When the EMT's arrived shortly thereafter, they confirmed that the subject had no vital signs of life. The officers finished securing the scene and awaited the arrival of the homicide detectives.
Detective James Wright of the Jefferson Parish Sheriff's Office Homicide Division testified that when he arrived on the scene, he observed the victim lying on the bed and also observed that the victim's wallet, which contained money, was lying on the dresser close to the bed. He also testified that there was money in the dresser and that he did not observe any evidence of a potential break-in.[2]
When Lieutenant Don English, Assistant Commander of Jefferson Parish Sheriff's Office Homicide Division, arrived on the scene, he took a recorded statement from Rosetta Jones with respect to information that might be pertinent to the investigation. In this statement, which was taken on Monday, May 3, 1993, at 4:49 a.m., Mrs. Jones claimed that she and Warner went to bed together about 11:30, but that at 12:30, she got up, watched television for a little while and then laid on the sofa and fell asleep. She was later awakened when she heard her husband cry out "No! Oh my God!" She also heard about three or four noises that sounded the same. Worried about her children,[3] Mrs. Jones went into their bedroom, woke them up, got them out of bed, and put them in the closet. Mrs. Jones pushed the bed against the door, grabbed a baseball bat for protection, and sat in the closet with her children. She also said in this interview that when she went into the boys' room, she thought she heard something like a firecracker. Although she wanted to check on her husband, she was scared and wanted to get her children out of the house.
Thereafter, on Thursday, May 6, 1993, at 8:07 p.m., Detective James Wright, the case officer, took another recorded statement from Rosetta Jones. In this interview, the officer obtained additional background information from Mrs. Jones, including information about her prior marriages, her children, her employment, her medical problems, and the fact that she had been pretending to be pregnant with twins.
Detective Wright also inquired about her friendship with Jeanne Foret. Mrs. Jones claimed that although they were friends, Jeanne Foret had quit coming around because they had disagreements about her husband and children because Foret thought that Warner was not taking care of the children properly. Mrs. Jones also stated that she knew that Foret was a lesbian, and that Foret had told her that she loved her, but she, Mrs. Jones, told Foret that they were just friends. Mrs. Jones also said the last time that she talked to Foret prior to Warner's death was on that Sunday afternoon.
At the end of this interview, the officer asked Jones if she had anything to do with or if she had killed her husband. Mrs. Jones told the officer that she did not kill her husband, that she had nothing to do with the killing, and that she did not know of anyone who did. At trial, Detective Wright testified that Mrs. Jones was not a suspect at the time this second statement was taken.
Detective Wright took a third statement from Rosetta Jones on May 7, 1993 at 11:42 a.m.[4] It was in this third statement that Jones implicated Jeanne Foret in the murder of her husband. Jones claimed that on the night of the murder, she and her husband went to bed about 11:30, and at some point she thought she heard a noise. Since she was awake, she got up to go to the bathroom and to get something to drink. On her way to the kitchen, she saw a "black body" with what appeared to be a gun in one hand. The individual also had something on her face, like camouflage paint, and was wearing a dark shirt, hat, and pants. At first she thought that the subject was a man, but *214 when she heard the individual say in a gruff voice that "I've come to take care of you and your kids," she realized that the subject was Jeanne Foret.
After telling Foret to go away and leave them alone, Jones ran to her children's room and barricaded herself and her two boys in the room. Jones heard her husband say "Oh, no, God no," and she heard a loud "pop" and a "thud." On that Monday, Jeanne Foret visited Mrs. Jones and whispered, "I'm gonna take care of you, you don't have to worry." On Tuesday evening, Foret visited Jones again and once more told her that she was going to take care of her and at some point and she also told Jones that she loved her.
During this statement, Jones admitted that Foret had made negative comments about her husband, that Foret had expressed that she had feelings for her and she also admitted that she had had sex with Foret about two or three times. At trial, Detective Wright testified that when he spoke to Mrs. Jones on May 7, 1993, she was not a suspect.
After this statement, the officers tried to gather information on Jeanne Foret, and later that afternoon, Officer Wright asked Jones for assistance in locating Foret. Jones, while at the police station, subsequently contacted Foret by telephone. The telephone conversation between Jones and Foret was recorded with Jones' knowledge and permission. During this phone conversation, when Rosetta Jones asked Foret why she killed her husband, Foret responded "I have no idea.... I guess I'm nuts." At another point during the conversation, Foret stated that she was not at the house on that night, that she was at home, and that she had not seen Rosetta Jones in nine months. Foret also said that "I hate [the fact] that the man's dead too."
The police officers subsequently obtained an arrest warrant for Jeanne Foret. On Friday, May 7, 1993, at approximately 11:45 p.m. Jeanne Foret surrendered to authorities at the Lafourche Parish Sheriff's Office located in Lockport, Louisiana. When Foret came into the office, Captain Robert Dill, who had been apprised that defendant was to surrender in his office, immediately advised her of her rights. Ms. Foret signed the rights form indicating that she understood her rights and wished to waive them. Captain Dill did not question defendant about the murder, and she did not make any statements to him.
Lieutenant Don English and Detective Philip Ramon of the Jefferson Parish Sheriff's Office traveled to Lockport after the subject surrendered. Shortly after their arrival, Detective Ramon filled out a rights of arrestee or suspect form and advised Foret of her rights. Foret placed her initials next to each right listed on the form indicating that she understood each individual right and then signed the form indicating that she understood her rights and wished to waive them.
Upon the arrival of Officers English and Ramon in Lockport, they learned that a tree on property on Pertuit Lane, owned by Cathy Griffin, Foret's sister, had been used for some type of target practice. Pursuant to Cathy Griffin's consent, the officers searched the property and recovered projectiles that had been fired into the tree. Also, Elaine Chouest, Foret's other sister, voluntarily turned over to the officers evidence that was in her house consisting of the box that Foret's gun came in, as well as some ammunition. Chouest then drove Foret's car to the police station in Lockport. After Foret signed a form consenting to the search of her car, the officers searched the car, and recovered a Wal-Mart receipt for the purchase of a .38 caliber Rossi revolver. Foret was then released to the custody of Lieutenant English and Detective Ramon and was transported to Jefferson Parish.
During the ride to Jefferson Parish, Lieutenant English asked Foret if she wanted to speak about the incident without the presence of an attorney and she said that she would. Lieutenant English testified Ms. Foret then told him about the following recurring dream:
She told me that she saw herself all dressed in black, black clothing, black pants, black shirt, and she saw herself drive over to Rosetta Jones' house; she got out of her car and went through a side *215 gate, went into the back of the house, through a laundry room, through the kitchen, across like a den area to the master bedroom, where she saw Warner Jones sleeping with his backon his sidewith his back to the door. She said that she walked in the room and she fired one shot, at which time he turned and looked at her, or said her name, or something to that effect, at which time she ran and jumped into the bed, on top of him, and stood over him and shot him twice more. Then she ran out of the house, got in her car and left.
Once they arrived at the detective bureau, Lieutenant English advised Foret of her rights, executed a waiver of rights form, and then took a taped statement from her. In this statement which was taken on May 8, 1993 at approximately 5:29 a.m., Foret told the police that she and Rosetta Jones had been lovers for approximately six months but that Jones ended the relationship because she said that it was getting out of hand. Foret admitted that she had recently bought a .38 caliber Rossi gun, as well as ammunition, from Wal-Mart for protection purposes, and that she and some family members had target practice with the gun.
On that Sunday, Foret left her sister's house in Raceland and proceeded to her apartment on the Westbank. She remembered that she took one or two tranquilizers and drank a wine cooler. The next thing that she was able to remember was waking up the following morning and being informed that Mr. Jones had been killed. Foret then started having another recurring dream in which she saw herself at the Jones' residence with a gun in her hand, firing three shots at Warner. In this statement, Foret admitted that she loved Rosetta Jones and that she did not like Warner because he always criticized his wife and children.
After Foret gave this statement, Detective Ramon transported her to the Jefferson Parish Correctional Center. During that time, Foret made a comment that she felt better, and the officer told her that she ought to do the right thing and that if there was more to the story, she should tell them. Foret made a comment that there was more to the story, but she would have to think about it. On Sunday, May 9, 1993, Detective Ramon picked Foret up from jail and brought her to the detective bureau. At this time, he executed another advice of rights form with Foret. Foret signed the form indicating that she understood her rights and wished to waive them.
In Foret's final statement which was taken on May 9, 1993, at 4:20 p.m., she claimed that she had had no contact with Jones for nine months, but that on April 19, 1993, Jones called and asked Foret if she knew of anyone who could make her a widow, that she was fed up with the situation at home and that she was tired of Warner mentally abusing her and the kids. After that initial contact, the two talked possibly every day leading up to the murder. On one of those occasions, Jones asked Foret to run Warner over when he walked to work, but Foret told Jones that she could not do that.
Foret also admitted again that she bought a gun from Wal-Mart on April 23, 1993, but claimed that she bought it for protection purposes because she was going to stay alone at her sister's house in Raceland. When she mentioned to Jones that she had bought a gun, Jones asked her to kill Warner that same night. Foret told Jones that she could not shoot him; however, Jones persisted and continuously told Foret how abusive Warner was to her and the boys.
On another occasion, around April 28, 1993, Jones asked Foret to do a drive-by shooting of Warner. Foret admitted that she came to Marrero on that Thursday morning to do what Jones requested, but that she could not follow through with the drive-by shooting. When she subsequently called Jones to tell her that she could not do it, Jones responded "guess you'll have to do it another time."
On Friday, Jones and Foret talked again and in this conversation, Jones told Foret to go to their house early Saturday morning, and that she would leave the doors unlocked for her. Jones told Foret to stand by the stereo and to make some noise as if an intruder was in the house, and then when her husband walked in, Foret was to shoot him.
*216 Pursuant to that conversation, Foret went to Jones' house, found the doors unlocked, entered the house and stood by the stereo. However, Foret started feeling sick when she thought about what she was going to do, and she immediately left the Jones' house and drove back to Raceland. When Foret later called Jones to tell her what had happened, Jones told Foret that she wished that she would have left the gun and Jones would have done it herself.
Jones then asked Foret to come back early Monday morning between 1:30 and 2:00, that it had to be done that night and that she was tired of his abuse. Jones assured Foret that with Warner out of the way, they could be together, that she and her boys would be able to have a normal life without any fears, and that she could live on the insurance money for awhile. After telling Foret that this would be the best thing for the boys, Foret agreed to go to Jones' house and kill Warner.
Foret went to her house that night and found the doors unlocked as was planned. Mrs. Jones came to the door and told Foret that she wanted to make sure that everything was clear and that Warner was still asleep. With Jones' persuasion, Foret walked into the bedroom. While Foret was in there, Warner Jones turned his head and opened his eyes. Foret then panicked and shot him in the back. Foret then thought that she saw Warner get up, and she panicked again and shot him two more times. She then ran out of the house and went home. In this statement, Foret claimed that she did not intentionally kill Warner Jones.
Subsequently, on May 10, 1993, Detective Wright interviewed Rosetta Jones. At trial, he testified that although she was not a suspect at this time, she became a suspect shortly thereafter. In this statement that was begun at 12:24 p.m., Jones talked about her relationship with Foret and claimed to have ended it about ten months prior to the shooting. According to Jones, Foret called her on Sunday, May 2, prior to the shooting, and told Jones that she could get Warner out of the picture and that she could do a better job taking care of her, Mrs. Jones and the kids. Jones claimed that on the night of the shooting, she saw Foret in the kitchen with a gun and begged her to leave, but Foret told Jones that she was going to take care of Warner. Jones denied any involvement in plotting with Foret to kill Warner, and she also denied leaving the doors unlocked so that Foret could have easy access to the house. Jones claimed that she had nothing to do with her husband's death and that she never talked to Foret about the killing.
When some of the things that Jones told the officer did not make sense, Detective Wright stopped the statement, went and talked with Lieutenant English and told him that they should consider Rosetta Jones a major suspect. Shortly after his conversation with Lieutenant English, Detective Wright advised Rosetta Jones of her rights and executed a rights of arrestee or suspect form with her. Jones signed the form indicating that she understood her rights and also signed indicating that she wished to waive her rights. In this final recorded statement that was taken from Jones on May 10, 1993 at 1:14 p.m., she talked about Warner's drinking habits, as well as the abuse she and her children suffered because of Warner. In this statement, Jones admitted that she knew that Foret was coming that night to get rid of her husband and she also admitted that they talked about "the actual thing" a couple of times before the shooting occurred.
In connection with the investigation, Foret took the officers to a location in the Lafitte area where she discarded the black clothing that she wore during the homicide. At trial, Detective Ramon testified that from the swampy area, the police recovered the black clothing, including a hat, pants, gloves, and sweatshirt. Foret also led the officers to the point on the Causeway Bridge where she discarded the weapon. Deputy Anthony Martina, a diver with the Jefferson Parish Sheriff's Office, subsequently made a dive and recovered the weapon from the bottom of Lake Pontchartrain.
After being stipulated as an expert in forensic pathology, Dr. Fraser Mackenzie testified that he performed an autopsy on Warner Jones on May 3, 1993. Dr. Mackenzie observed three gunshot wounds to the body *217 and determined the cause of death to be gunshot wounds to the body, with perforating wounds of the lung and heart.
Captain Louise Walzer of the Jefferson Parish Sheriff's Office testified as an expert in the field of firearms identification. In connection with this case, she examined two projectiles that were recovered at the morgue from the body of Warner Jones and one projectile that was recovered from the mattress at the scene of the crime. As a result of her examination, she determined that these three projectiles were fired from the.38 caliber Rossi.
In addition to the testimony of the witnesses that set forth the factual scenario surrounding the offense and the investigation, there were numerous other witnesses who testified at trial.
Skylar Salmons, son of Rosetta Jones by a previous marriage, testified that in September of 1985, his mother called him and asked him to pick up her husband at the time, Glennis Brown, in their van. His mother then wanted Skylar to knock Glennis in the head and burn him in the van. His mother asked him to kill Glennis because she could not deal with him anymore, and she could not afford the van, so she wanted to collect insurance money.
Stephanie Salmons, a daughter of Rosetta Jones by a previous marriage, testified that in October or November of 1986, her mother asked her to obtain some LSD to make Glennis Brown, her husband at the time, take an overdose. Her mother also told her that if she got in trouble, there would be insurance money to bail her out of jail.
Katherine Bertolino, Assistant Director of Human Resources at JoEllen Smith Medical Center, testified that Jones was an employee of the hospital in May of 1993. She testified that Jones, through the benefits package offered at work, had obtained a $400,000.00 accidental death insurance policy on her family, which included coverage on her spouse and children. Jones had also obtained a $50,000.00 life insurance policy on her spouse. Ms. Bertolino testified that a couple of days after the murder on May 3, 1993, she received a phone call from someone identifying herself as Rosetta Jones. After the person on the phone identified herself, she said, "I'm calling about my insurance premium. What are you trying to do, wait until my insurance is lapsed to tell me that my insurance is due?"
Troy Bond, Director of Human Resources at JoEllen Smith Medical Center, testified that Jones took maternity leave approximately two weeks before the incident.
Glynell Kenney testified that she knew Rosetta and Warner Jones and Jeanne Foret from working with them at the West Jefferson Medical Center. She testified that she knew that Rosetta Jones and Jeanne Foret were involved in a lesbian relationship, and on cross-examination, she added that when Rosetta Jones ended the relationship, Foret was devastated. Foret had told her that Warner was the only thing standing in the way of her and Rosetta Jones being happy forever. Foret called Kenney the Friday following the murder and told her that she had a dream that she shot Warner and that she thought she (Foret) actually did it.
Leonard Hale, Jr., Vice-President of Human Resources at West Jefferson Medical Center, testified that a few days following Warner's death, Rosetta Jones came into the office to inquire about the benefits if any, that Warner had through his employment. Mr. Hale told her that she was not the beneficiary of the policy and therefore he could not release any other information. Mr. Hale then testified that Jones appeared to be somewhat "annoyed" as a result of receiving this information.
Arthur Thayer, Sr., chief technologist in the radiology department at West Jefferson Medical Center, testified that he was Warner Jones' immediate supervisor. He described Warner as an excellent employee and further testified that in late April of 1993, Warner Jones requested time off for the birth of his expected children.
Anthony Joseph testified that he met Jeanne Foret and Rosetta and Warner Jones at West Jefferson Medical Center where he was also an employee. Joseph became friendly with Warner and visited his house on several occasions. He testified that Warner *218 played well with the children and there did not appear to be any animosity between Warner and the children. He never saw Warner strike the children nor did he see him mentally abuse them. He saw Foret at the Jones' house about three times and on one visit in the later part of April, Foret seemed mad (angry) about something.
Elaine Chouest, Foret's sister, testified that she saw Foret on Monday morning, May 3, 1993, at about 10:00 or 10:30 and that Foret was acting strangely. She also recalled that Foret had told her in the past that Warner was not a good man for Rosetta Jones and that she hated him.
After the state rested its case, counsel for Foret called Elaine Chouest as a witness. She testified that the statement that her sister, Jeanne, made to her about hating Warner occurred about ten months before the shooting which would have been around the time that her relationship with Jones ended.
Jeanne Foret then testified in her own behalf. Foret admitted that she had a sexual relationship with Jones that began in September of 1991 and ended in August of 1992. The next contact that she had with Jones was in February of 1993 when she called Jones to congratulate her on being pregnant. Then, in April of 1993, Jones called Foret asking her if she knew of anyone who could make her a widow. Foret denied that she attempted to run Warner over or that she attempted to do a drive-by shooting. However, she admitted that on the morning of May 2, she entered the Jones' residence at Rosetta Jones' request, but left the house and drove to her sister's house in Raceland because she got sick thinking about what she was going to do.
Jones again contacted Foret and told her that Warner was abusive to her and her children and that she wanted Foret to pick them up and take them away. Jones told Foret that she would be packed and ready to go and asked Foret to pick them up at 1:30 Monday morning while her husband was asleep. Foret again went to the Jones' residence on May 3 and entered through the unlocked doors. She was greeted by Rosetta Jones, but then Foret waited in the utility room while Jones made sure that her husband was asleep. Foret subsequently went to the bedroom where Warner was sleeping to get the suitcase. According to Foret, when she went to look for the suitcase, she passed the bed, and Warner grabbed her arm. During the ensuing struggle, she got scared and shot Warner in the back. Warner would not let go of her arm so she shot him two more times. During her testimony, she claimed that she did not have any specific intention to kill Warner Jones.

JURY VERDICT
After considering the testimony presented, the jury found each defendant guilty as charged to second degree murder.

ASSIGNMENT OF ERRORS
On appeal, both defendants assign the following errors:
1. The trial court erred in denying the motion to suppress any alleged confession.
2. The trial court erred in denying appellant's motion to sever her trial from that of her co-defendant.
Jones also assigned the following error:
3. The trial court erred in allowing evidence of prior bad acts.
Finally, both defendants assigned as error any and all errors patent on the face of the record.

ASSIGNMENT OF ERROR NUMBER ONE
The trial court erred in denying the motion to suppress any alleged confession.
Each defendant filed a motion to suppress confession, identification, and physical evidence, alleging in part that:
All inculpatory statements and/or confessions to be used against the defendant by the State in this matter were obtained unlawfully and illegally because:
1. They were not made to police officers or to anyone else freely and voluntarily, but were made under the influence of fear, intimidation, threats or other duress, or *219 because of promises or other inducements; and/or
2. Defendant had not been advised of his rights under Miranda, or had invoked his right to remain silent or to have an attorney and this right had not been honored.

HEARING ON MOTION TO SUPPRESS
At the January 21, 1994 suppression hearing, the trial court heard testimony about the circumstances surrounding the taking of Jones' and Foret's statements, as well as testimony regarding the seizure of certain evidence.
Detective Robert Dill of the Lafourche Parish Sheriff's Office testified that on May 7, 1993, Jeanne Foret surrendered to authorities in Lockport at about 11:45 p.m. Officer Dill advised her that Jefferson Parish had an outstanding arrest warrant on her for murder and then advised her of her rights. Foret signed the advice of rights form acknowledging that she had been advised of her rights, that she understood her rights, and that she wished to waive those rights. Officer Dill did not take any type of statement from Foret and did not discuss anything substantive with her about the case.
Detective Philip Ramon testified that he traveled to Lockport to meet Foret. When he first came into contact with Foret, he filled out a Jefferson Parish rights of arrestee or suspect form. He read the rights to Foret and then gave her an opportunity to read the rights herself. Foret signed the form indicating that she understood her rights and also signed indicating her desire to waive those rights. Detective Ramon testified that at the time she signed this form, Foret was aware that she was under investigation for first degree murder. He further testified that no force or coercion was used to get her to sign the waiver form, nor were any promises made to her. He did not question her at that time, but on their ride back to Jefferson Parish, Foret gave the officers a voluntary statement.
Detective Ramon then executed another rights form with Foret on May 9, 1993 at 4:10 p.m. at the detective bureau. He read her each of her rights and she once again signed the form acknowledging that she understood her rights and wished to waive those rights. After this form was filled out, she gave a recorded statement. At no time during this statement did Foret indicate that she wanted a lawyer present or that she wanted to stop questioning. Detective Ramon testified that Foret was completely aware of what she was doing, and that no force or coercion was used in order to get her to waive her rights and make a statement, nor was she given any promises or inducements.
With regard to Foret, Lieutenant English testified that on their car trip back to Jefferson Parish with Foret, she gave a voluntary oral statement. When they arrived at the detective bureau, he then executed a waiver of rights form with her on May 8, 1993. Lieutenant English read the rights to Foret and also gave her an opportunity to read them herself. She initialed the form after each right acknowledging that she had read them, and then signed the form at the bottom indicating that she was advised of her rights, understood them, and wished to waive them. Foret thereafter gave a recorded statement. The officer testified that no force or coercion was used to get Foret to waive her rights or give a statement, nor were any promises made to her. At no time did Foret indicate that she wanted to stop talking or that she wanted a lawyer present. English testified that Foret was very coherent.
With regard to defendant Jones, Lieutenant English testified that on May 3, 1993, at 4:49 a.m., he responded to the scene of a homicide on Fir Street in Marrero. At that time, he interviewed Rosetta Jones, the wife of the deceased victim. According to Lieutenant English, Jones was not a suspect at this time and did not become a suspect until several days after the initial investigation.
Detective James Wright of the Jefferson Parish Sheriff's Office also testified at the suppression hearing. In the course of his investigation, he spoke to Rosetta Jones on various occasions. He specifically testified that he spoke to her on May 5, 1993 at 6:00 p.m., May 6, 1993 at 6:40 p.m. and 7:15 p.m., May 7, 1993 at 11:42 a.m. and May 10, 1993 around noon. During these interviews, Detective *220 Wright did not consider Mrs. Jones a suspect but questioned her to get background information on her marriage, her husband, her husband's friends and enemies, and information on who might have killed him. During these interviews, Jones was not under arrest nor in custody.
However, she did become a suspect on May 10, 1993 after she completed her first statement on that day. The officer immediately advised her of her constitutional rights in accordance with the Jefferson Parish Sheriff's Office rights of arrestee form. Detective Wright read Jones her rights and went over the rights form with her. Jones indicated that she understood her rights and then expressed a desire to waive her rights. After executing a waiver of rights form, Jones gave a final taped statement. The officer testified that no force or coercion was used in order to get her to waive her rights and give a statement. The detective additionally testified that she gave the statement voluntarily, with no promises of leniency made to her. At no time did she say that she wanted to stop the statement or confer with an attorney.
Wright clearly testified that it was on May 10, 1993, at 1:07 p.m., when Jones stopped being a victim and/or witness and became a suspect. He testified that prior to that time, the investigation had not focused on her as a murderer.
After considering the testimony presented, the trial judge ruled that the statements were admissible, that they were made without force or intimidation after defendants were appropriately advised of, and understood, their rights. The court also found that the search warrant was valid.
Because of an eighth "statement" which came to light, defendants filed a motion seeking to suppress this newly found statement and also asking the court to reconsider the previous motions to suppress. At the hearing of this motion on September 9, 1994, Detective James Wright testified that he was present, on Jones' side of a phone conversation, that occurred between Jones and Foret on the afternoon of May 7, 1993. At the time of this conversation, neither defendant was under arrest nor in confinement. Although Jones was at the investigations bureau when she made the call, the officers did not force her to make the call but rather she did it of her own free will. At the time of this phone conversation, Jones knew that the officers were trying to locate Foret and were investigating her with regard to the murder of Jones' husband. According to Detective Wright, the conversation was recorded with Jones' knowledge and consent. However, Foret was not aware that the conversation was being taped nor was she aware that any police officers were listening to this conversation.
In contrast to this testimony, Lieutenant Don English, when asked whether both Jones and Foret were suspects at the time of the phone conversation, stated: "I don't knowyes, I would say they were."
After considering the testimony, the judge gave the parties time to submit memorandums on the issues presented. Thereafter, in November of 1994, the court issued a judgment denying defendants' motion to suppress based on the following reasons:
IT IS ORDERED, ADJUDGED AND DECREED that defendant's Motion to Suppress Newly Found Statement is DENIED.
This Court previously denied Motions to Suppress confessions and evidence. Subsequent to this ruling, information was obtained that another telephone conversation was recorded by the Sheriff's Office between the two defendants. In this telephone conversation, each defendant denies her participation in the crime.
This Court finds that this recorded telephone statement between the two defendants occurred when neither defendant was in custody nor did either defendant give inculpatory information. Therefore, this statement is not subject to suppression.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Motion to Reconsider is DENIED.
This Court finds that the legal theory of "the fruit from the poisonous tree" is also not applicable. No new information was *221 obtained from this newly found recorded conversation.
This Court finds that the information obtained from this telephone conversation neither adds to nor changes the original information received from prior statements. Therefore, the Court is unwilling to change its original ruling regarding suppression of these statements. This Court finds that the subsequent statements of each defendant were given freely and voluntarily and with proper legal safeguards.
Defendant Jones thereafter filed a writ application in this Court seeking review of the trial judge's denial of the motion to suppress (Writ Number 94-K-1000). On January 31, 1995, this Court denied Jones' writ applications[5] stating as follows:
After a careful review of the writ application and attached transcripts and exhibits, we cannot say the trial court erred as a matter of law.
By this assignment, both defendants contend that the trial court erred in denying their motions to suppress any alleged confession. In their argument, the defendants focus on the third statement which Jones gave to police. Each contends that by the time of Jones' third recorded statement, she was clearly a suspect and subject to a focused investigation such that the third statement could only have been admissible had it been obtained following an advisal and waiver of rights. They continue by arguing that since the third statement was, in fact, the functional equivalent of a custodial interrogation, the failure to obtain an advisal of rights at that time rendered that statement constitutionally inadmissible and all subsequent statements inadmissible as "fruit of the poisonous tree."[6]
To support their argument that at the time of the third statement Jones was in a custodial situation, defendants point to the following factors:
1. Jones has been questioned at length both at the scene and at the Sheriff's Office;
2. Many aspects of her statement were known to be false;
3. The officers' suspicion of Jones prompted an "inconclusive" polygraph exam;[7] and
4. After over two hours of questioning at the investigations division, during which the polygraph was conducted, Jones finally at 11:42 a.m. made an inculpatory statement implicating appellant Foret.

ISSUE BEFORE US
The issue to be determined by us at this time is whether, at the time of the third recorded statement, Jones was in a custodial situation so as to require an advisal of rights as a prerequisite to the admission of that and all subsequent statements.

ANALYSIS
Before a confession or inculpatory statement may be introduced into evidence, the state must prove beyond a reasonable doubt that the statement was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; La.C.Cr.P. art. 703(D); State v. Vaccaro, 411 So.2d 415 (La.1982); State v. Pittman, 585 So.2d 591 (La.App. 5 Cir.1991), writ denied, 586 So.2d 545 (La.1991). If the statement was elicited during custodial interrogation the state must also show that defendant was advised of his constitutional rights as set *222 forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). State v. Castillo, 389 So.2d 1307 (La.1980); State v. Crook, 517 So.2d 1131 (La.App. 5 Cir.1987), writ denied, 541 So.2d 885 (La.1989).
In State v. Castillo, supra, the Louisiana Supreme Court stated that the safeguards enunciated in Miranda, supra:
... come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

State v. Castillo, supra at pp. 1310-1311.
Custodial interrogation includes situations which fall short of an actual arrest but where the accused is questioned by the police in a setting which indicated that he has been deprived of his freedom of action in a significant way. State v. Menne, 380 So.2d 14, 17 (La.1980), cert. den., 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980); State v. Watkins, 526 So.2d 357 (La.App. 4 Cir.1988). This determination is made on a case by case basis, and the factors involved include:
1. Whether there was probable cause to arrest prior to questioning;
2. Whether the statements and actions of the police indicate an intent to hold or restrain the accused;
3. Whether the accused reasonably believed he was restrained, and
4. The extent to which the investigation had focused on the accused. Id.

However, spontaneous and voluntary statements not made as a result of police interrogation or compelling influence are admissible in the absence of Miranda warnings even if the accused is in custody. State v. Thompson, 399 So.2d 1161 (La.1981). Also State v. Brown 598 So.2d 565, (La.App. 4 Cir.1992), writ denied, 605 So.2d 1092 (La. 1992).
In State v. Menne, supra, the Louisiana Supreme Court noted that the determination of whether a person has been taken into custody, detained or deprived of his freedom in a significant way must be decided by an objective test.
Any formulation making the need for Miranda warnings depend upon how each individual being questioned perceived his situation would require a prescience neither the police nor any one else possesses. On the other hand, a standard hinging on the inner intentions of the police would fail to recognize Miranda's concern with the coercive effect of the `atmosphere' from the point of view of the person being questioned.
In deciding the admissibility of a confession, the trial judge must consider the totality of the circumstances. His decision in this regard is entitled to great weight and will not be overturned on appeal unless it is not supported by the evidence. State v. Dunn. 94-776 (La.App. 5 Cir. 2/15/95), 651 So.2d 1378.
With regard to defendant Jones, Detective Wright expressly testified that at the time of Jones' third statement, in which she implicated Foret, Jones was not a suspect or in custody at this time. After this third recorded statement which occurred on May 7, Jones was very cooperative in helping the police locate Foret, and following her telephone conversation with Foret, Jones left the police station. Thus we agree with the trial court that Jones was not in a custodial situation or deprived of her freedom in any significant way so as to require an advisal of rights; hence, Jones' third recorded statement was not subject to suppression based on the failure to advise her of her rights.
Between this day and the date of Jones' next recorded statement, Foret gave the police a statement implicating Jones in the murder of her husband. When Jones began the statement on May 10, 1993, she was not advised of her rights. Notwithstanding Lieutenant English's uncertainty as to when Jones became a suspect, there was testimony by Detective Wright, the case officer, that Jones was not a suspect until May *223 10, 1993, some time during or after the completion of her first statement on that day. At the point she became a suspect, the officer immediately advised her of her Miranda rights and went through the Jefferson Parish Sheriff's Office rights of arrestee form. Jones indicated that she understood her rights and, thereafter, chose to waive her rights and give a final statement. Jones did not implicate herself in any way in the commission of the crime until her final statement which she gave after she was fully advised of her rights. We find those facts show that once she was considered to be a suspect, the police officers took the necessary constitutional precautions to honor Jones' constitutional rights.
With regard to Foret, it is clear from the testimony presented that she was fully advised of her rights prior to all of her statements and that she freely and voluntarily waived those rights.
In concluding that Jones' third statement was not obtained in violation of her constitutional rights, we hold that the trial judge did not err in refusing to suppress the defendants' statements. Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
Each defendant alleges that the trial court erred in denying her motion to sever her trial from that of her co-defendant. Jones filed a motion to sever parties pursuant to La.C.Cr.P. art. 704, alleging the following grounds for the severance:
(1) The jury will have insurmountable difficulty in distinguishing the alleged act(s) of this defendant from the alleged acts of her co-defendant, Jeanne Foret;
(2) The defendant maintains that she is innocent of the offense alleged in the indictment/bill of information and intends to defend herself against these accusations as vigorously as the law allowed;
(3) The defendant alleges that being tried together will subject the defendant to undue prejudice due to a perceived taint as a result of mere association with Jeanne Foret during a common proceeding;
(4) Actual antagonistic defenses do exist as proved by the numerous statements provided by both the defendant and co-defendant;
(5) The co-defendant has indicated in statements to the State that she has shifted blame in this matter to the defendant in an obvious attempt to exculpate herself; (6) Justice necessitates a severance pursuant to the facts of the case, the statements and the case law. See State v. Thibodeaux, 315 So.2d 769 (La.1975); State v. Lavigne, 412 So.2d 993 (La.1982); State v. McGraw, 366 So.2d 1278 (La.1978).
Counsel for Foret joined in Jones' motion for severance. On March 18, 1994, the trial judge denied both defendants' motion for severance, based on the following grounds:
Alright. As I indicated, I have read all the statements. I have read uh, some of them more than once. I've gone through both briefs. Will thank all counsel in that regard, that they were very thorough and I appreciate that.
I believe however, that the final statements that there is not that much in inconsistencies. The ones that there are, I don't think are material to the issues in this particular case.
And I will tell you and make it a part of the record that it was the last statements of each of them is what caused me to make up my mind to deny the Motion to Sever. I believe any inconsistencies are not material to uh, this particularthe crime that is charged with both of them, so I'm going to deny the Motion to Sever.
Based on the discovery of the "eighth statement," defendants subsequently filed a motion to reconsider severance which was also denied by the trial judge. From this denial, Jones filed a writ application in this Court seeking review of the trial judge's denial.[8] On January 31, 1995, this Court denied defendant's writ application. Prior to the commencement of trial, the parties reurged a motion for severance which was again denied.
*224 Defendants now contend that the trial court erred in denying their motion for severance and their motion to reconsider severance.

ANALYSIS
La.C.Cr.P. art. 704 reads as follows:
Jointly indicted defendants shall be tried jointly unless:
(1) The state elects to try them separately; or
(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
The accused is not entitled to a severance as a matter of right, but the decision is one resting in the sound discretion of the trial judge.[9] A denial of a motion to sever will not be overturned on appeal absent a clear abuse of discretion. State v. Webb, 424 So.2d 233 (La.1982); State v. Myers, 584 So.2d 242 (La.App. 5 Cir.1991), writ denied, 588 So.2d 105 (La.1991), cert. denied, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992).
Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm, 446 So.2d 729 (La. 1984). A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent a co-defendant attempts to place the blame on the other, causing each defendant to defend against his co-defendant as well as the State. State v. Myers, supra. However, the mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance. State v. Prudholm, supra.
The defendant bears the burden of proof in such a motion; allegations are not enough. State v. Diaz, 461 So.2d 1099 (La. App. 5 Cir.1984).
The fact that each defendant has pointed a finger at the other does not make defenses automatically antagonistic. Prejudice must be shown if defendants are to receive separate trials. State v. Williams, 416 So.2d 914 (La.1982); State v. McCarter, 469 So.2d 277 (La.App. 2 Cir.1985).
Justice does not require severance where only the extent of participation of each defendant is at issue. State v. Gaskin, 412 So.2d 1007 (La.1982). The degree of blame each seeks to cast upon the other does not suffice to warrant severance. State v. Simmons, 381 So.2d 803 (La.1980), cert. denied, 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 498 (1980).
In the present case, the defenses are not antagonistic and we do not find that justice required a severance. Because Foret admitted doing the actual shooting, it is the degree of participation of each defendant that is at issue. As we judge it, the question with regard to Jones is whether she knew about Foret's plan to murder her husband, and had discussed it with her; or whether Jones had actually aided and planned the murder with Foret. Based on the foregoing discussion, we do not find that the trial judge abused her discretion and hold that there is no error in denying both defendants' motion for severance.
As part of her severance argument, Jones additionally argues that a further problem existed during this trial pursuant to Bruton v. U.S., 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Specifically, Jones asserts that since her multiple statements were introduced at trial and she did not testify, Jeanne Foret did not have the opportunity to cross-examine Jones in violation of the Sixth Amendment to the United States Constitution. In Bruton, the United States Supreme Court reversed the robbery convictions of a defendant who had been implicated in the crime by his co-defendant's confession. The high court held that because the codefendant did not take the stand at the joint trial and, thus, could not be cross-examined, *225 the admission of his confession violated the defendant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.
The Bruton issue is in applicable to the present case inasmuch as it is raised by Jones, who was not denied her right to cross-examine ForetForet did testify at trial.[10]
Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THREE (ROSETTA JONES)
Jones alleges that the trial court erred in allowing evidence of prior bad acts as to her.
On April 29, 1994, the state, in accordance with State v. Prieur, 277 So.2d 126 (La.1973) filed its notice of intent to use evidence of other crimes. Specifically, the state noted its intent to use evidence that:
1. Rosetta Jones solicited Stephanie Salmons in October or November of 1986 to murder her husband at the time, Glennis Brown;
2. Between September and November of 1985, Rosetta Jones solicited Skylar Salmons to murder her husband at that time, Glennis Brown.
The state noted that the purpose of using the above evidence was to show Jones' "knowledge, intent, guilty knowledge, system and motive."
On November 13, 1995, immediately prior to trial, the court conducted a hearing to determine the admissibility of this evidence. At the hearing, Skylar Salmons and Stephanie Salmons, Rosetta Jones' children by a previous marriage, testified, as they later would at trial, relative to their mother's attempts to dispose of Glennis Brown: Skylar was asked by his mother to burn Brown in the van, while Stephanie was asked to give Brown an overdose of LSD.
After listening to the testimony of these two witnesses and the argument of counsel, the trial judge ruled the evidence to be admissible.
Jones now contends that the trial judge erred in allowing the testimony of Skylar and Stephanie Salmons to be introduced at trial arguing that the prior incidents were not probative of the present incident, but were introduced merely to show that Jones was a bad person. In contrast, the state contends that the evidence of the prior acts was admissible to show Jones' intent to kill her husband, as well as showing plan, motive, preparation, knowledge, or absence of mistake or accident.

ANALYSIS
Generally, evidence of other crimes is in admissible in the guilt phase of a trial unless the probative value of the evidence outweighs its prejudicial effect and unless other safeguards are met. State v. Bourque, 622 So.2d 198 (La.1993); State v. Brown, 95-124 (La.App. 5 Cir. 5/30/95), 656 So.2d 1070.
This evidence is generally inadmissible because, in the determination of guilt or innocence, the admission of evidence of other crimes which the defendant has committed creates the risk the defendant will be convicted of the present offense simply because he is a `bad person'. State v. Bourque, supra at p. 233.
An exception to the general rule occurs where the state offers evidence of other crimes for purposes other than to show the character of the defendant. State v. Brown, supra.
La. C.E. art. 404B(1) provides for the admissibility of other crimes evidence and reads as follows:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, *226 plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
In its notice of intent, the state listed the purpose of using these other crimes to show "knowledge, intent, guilty knowledge, system and motive." Although the state used this general language, it appears that the main purpose for using this evidence was to show motive and/or intent. While the trial judge allowed the introduction of this evidence on the basis that it proved motive, the state, in its appellate brief, focuses on intent as the basis for its admissibility.
In State v. Abercrombie, 375 So.2d 1170 (La.1979), cert. denied, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980), the court discussed motive:
In State v. Sutfield, 354 So.2d 1334, 1336-37 (La.1978), we recognized that evidence of other crimes may be admissible if the evidence is relevant to show motive, i.e., to show that the defendant had a reason to commit the crime he is charged with. Motive is generally recognized as an independent basis of relevancy. See McCormick, Evidence, Section 190 at 450-54 (2d ed. 1972); 2 Weinstein and Berger, Weinstein's Evidence, Section 404(09) at 404-53 (1979); Comment, Other Crimes Evidence in Louisiana, 33 La.L.Rev. 614, 617 (1973). Nevertheless, `in order to have independent relevance, the motive established by the other crimes must be more than a general one, such as gaining wealth, which could be the underlying basis for almost any crime; it must be a motive factually peculiar to the victim and the charged crime.' State v. Sutfield, cited above, 354 So.2d at 1337.
In addition, as with all evidence of other crimes that is independently relevant, other crimes evidence admitted to show motive must satisfy two tests: 1) there must be clear and convincing evidence that the defendant did indeed commit the other crimes, and 2) the probative value of the evidence must outweigh the risk of prejudice-the risk that the evidence will be used to convict the defendant because he is a man with a criminal disposition. State v. Sutfield, cited above, 354 So.2d at 1337. See McCormick, Section 190 at 452-54; Weinstein and Berger, Section 404(10) at 404-66.
The existence of these two additional tests is necessitated by the rationale behind the general prohibition against evidence of other crimes, the fear that a defendant may be convicted because of a criminal disposition rather than actual guilt. In order to minimize the risk of prejudice, it must be clear (a) that the defendant committed the other crimes and (b) that their probative value exceeds the risk of prejudice to the defendant.
[Emphasis supplied].
In the present case, Skylar and Stephanie Salmons testified that Jones called and solicited them to kill or to assist to kill her husband at that time, Glennis Brown. Their testimony also indicated that there would be some insurance money as a result of his death.
Three requirements must be met in order that evidence of other crimes be allowed as proof of intent:
1. the prior acts must be similar;
2. there must be a real and genuine contested issue of intent; and
3. the probative value of the evidence must outweigh its prejudicial effect.
State v. Kahey, 436 So.2d 475 (La.1983); State v. Bonck, 613 So.2d 1125 (La.App. 5 Cir.1993), writ denied, 620 So.2d 840 (La. 1993).
In the present case, the three requirements of the introduction of other crimes evidence to show intent were clearly met. The other crimes were obviously similar in that defendant sought the help of people close to her to attempt to murder her husband. There was also a real and contested genuine issue of intent in that as even though Rosetta Jones did not actually pull *227 the trigger, the state still had to prove specific intent to kill on her part to support a conviction of second degree murder.[11]
Since Jones' statements which were introduced by the state tried to downplay her participation in the crime and, since the amount of each defendant's participation was at issue, it appears that intent was a genuine issue at trial. Further, we find that the probative value of the evidence outweighed its possible prejudicial effect.
Accordingly, we hold that the evidence was properly admissible to prove intent in the instant case. State v. Abercrombie, supra at p. 1175. See also State v. Parker, 625 So.2d 1364 (La.App. 1 Cir.1993), writ denied, 93-2832 (La.2/25/94), 632 So.2d 761; State v. Hereford, 518 So.2d 515 (La.App. 3 Cir.1987).

ERROR PATENT REVIEW
An error patent review was requested by both defendants and was conducted in accordance with La.C.Cr.P. art. 920 and State v. Oliveaux, 312 So.2d 337 (La.1975), revealing that the trial court incorrectly instructed defendants of the prescriptive period for post-conviction relief at the time of sentencing and, in addition, the trial judge failed to advise defendant of the provisions of La. C.Cr.P. article 894.1D.
La.C.Cr.P. art. 930.8A provides that no application for postconviction relief, including applications which seek an out-oftime appeal, shall be considered if filed more than three years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922.
Paragraph C of that article instructs the trial judge to inform defendant at time of sentencing of the prescriptive period for post-conviction relief. In the present case, at the time of sentencing, the trial judge advised each defendant that she had three years from the date she was sentenced to file for post-conviction relief, whereas she should have advised each defendant that she had three years after the date when the judgment of conviction and sentence has become final. Accordingly, the trial court is ordered to send appropriate written notice to defendants of the correct statement of the law regarding the prescriptive period for postconviction relief and to file written proof in the record that defendant received the notice. State v. Kershaw, 94-141 (La.App. 5 Cir. 9/14/94), 643 So.2d 1289.
Additionally, the trial judge failed to advise defendant of the provisions of La. C.Cr.P. art. 894.1D.[12] However, paragraph F of that article specifically provides that no sentence shall be declared unlawful or inadequate for failure to comply with the provisions of Paragraph D. Accordingly, the case is remanded for the further purpose of directing the trial court to inform the defendant of the provisions of La.C.Cr.P. art. 894.1D by sending appropriate written notice to defendant within ten days of the rendition of the opinion and filing written proof that *228 the defendants received the notice in the record of the proceedings. State v. Woolridge, 95-971 (La.App. 5 Cir. 2/27/96), 670 So.2d 1332.

DECREE
For the foregoing reasons, the convictions and resulting sentences in the present case are affirmed and the case is remanded, for the reasons expressed hereinabove, for correction of patent errors.
CONVICTIONS AND SENTENCES AFFIRMED; CASE REMANDED.
NOTES
[1] At trial, Patricia Ridge, a neighbor of Warner and Rosetta Jones, testified that in the early morning hours of May 3, she was awakened when she heard her doorbell ring and a frantic female voice, that of Rosetta Jones, crying that something had happened and that she thought she heard shots. Ms. Ridge's son immediately called the police for assistance.
[2] In contrast to this testimony, Deputy Folse testified that he did observe some damage to the back door, which could be indicative of a forced entry.
[3] At the time of the incident, Rosetta Jones' two boys by a previous marriage lived at the residence with her and Warner.
[4] There were two different times noted on this statement, 5:36 a.m. and 11:42 a.m. The officer testified that the statement was actually taken at 11:42 a.m.
[5] The denial of defendant's writ application does not bar reconsideration of the issue on appeal. State v. Fontenot, 550 So.2d 179 (La. 1989); State v. Byes, 94-611 (La.App. 5 Cir. 12/28/94), 648 So.2d 1073.
[6] Each defendant is trying to suppress Jones' third recorded statement as well as all subsequent statements obtained from both Jones and Foret by relying on State v. Diaz, 461 So.2d 1099 (La.App. 5 Cir. 1984) to support their argument. Diaz dealt with a co-defendant's standing to contest the validity of search and seizure of evidence from the other defendant. State v. Burdgess, 434 So.2d 1062 (La. 1983) holds that a person adversely affected by a confession unlawfully obtained from another has no standing to raise its illegality in court. See also State v. Byrd, 568 So.2d 554 (La. 1990). Nevertheless, the issue must be addressed regarding Jones since it is her statement at issue.
[7] Allegations No. 2 and No. 3 were taken from statements made in an affidavit for a search warrant sworn by Detective Wright.
[8] Writ No. 94-K-1000.
[9] When a severance is sought before trial, the standard for obtaining a severance is broader because of the speculation as to what the trial evidence will actually be; and after trial commences, the standard is stricter because at that time the trial judge is able to analyze the evidence which has actually been admitted. State v. Fleming. 574 So.2d 486 (La.App. 4 Cir.1991), writ denied, 592 So.2d 1313 (La. 1992).
[10] Furthermore, the Bruton rule is inapplicable when, as is the case here, the defendant has confessed and her confession interlocks with and corroborates the confession of her co-defendant. Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). Also, see State v. Murphy, 463 So.2d 812 (La.App. 2 Cir. 1985); State v. Smith, 623 So.2d 942, 944 (La.App. 4 Cir. 1993).
[11] Under La. R.S. 14:24, not all principals are automatically guilty of the same grade of offense. One who aids and abets in the commission of a crime may be charged with a higher or lower degree of the crime, depending upon the mental element proved at trial. Thus, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. State v. Holmes, 388 So.2d 722 (La. 1980); State v. Tobias, 452 So.2d 157 (La. 1984); State v. Girod, 94-853 (La.App. 5 Cir. 3/15/95), 653 So.2d 664.
[12] D. Immediately following the imposition of a felony sentence pursuant to this Article, the sentencing court shall advise the offender in open court of each of the following:

(1) Whether, pursuant to the provisions of R.S. 15:571.3, the offender's sentence is subject to diminution for good behavior.
(2) Whether the sentence imposed was enhanced pursuant to R.S. 15:529.1 et seq., Article 893.3, or any other relevant provision of law.
(3) The prospective release date of the offender should his sentence be subject to diminution of sentence for good behavior, to the extent that the court shall advise the offender that he may be released upon serving the certain percentage of his sentence as provided for by law.
(4) Whether, pursuant to the provisions of R.S. 15:574.4(A)(1) and (3) and (B), the offender is subject to parole eligibility.
(5) The prospective parole eligibility date of the offender should he be eligible for parole pursuant to R.S. 15:574.4 et seq., to the extent that the court shall advise the offender that he may be eligible for release upon serving the certain percentage of his sentence as provided by law.