880 So.2d 841 (2004)
STATE of Louisiana
v.
Damaris JACKSON.
No. 03-KA-883.
Court of Appeal of Louisiana, Fifth Circuit.
April 27, 2004.
*843 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Juliet Clark, Walter Amstutz, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., MARION F. EDWARDS and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Defendant, Damaris Jackson On March 8, 2001, appeals his conviction for one count of second degree murder (LSA-R.S. 14:30.1) and one count of attempted second degree murder (LSA-R.S. 14:27, 14:30.1). We affirm.
Quentin Wiley, charged in the indictment as a codefendant, was tried along with Jackson. His appeal is a companion case to the instant opinion.[1] Jackson was arraigned and pled not guilty. He filed a *844 Motion to Amend Original Plea which the trial court granted, allowing Jackson to change his plea to not guilty and not guilty by reason of insanity.
Jackson filed several pre-trial motions, including motions to suppress the confession, identification and evidence. The trial court heard and denied the motion to suppress the confession. Jackson also filed a Motion to Sever Parties, which motion the court heard and took under advisement. That motion was later denied, and subsequently the court heard and denied the motions to suppress evidence and identification.
Jackson and Wiley were tried together by a twelve-person jury on April 9, 10, 11, and 12, 2002. The jury returned verdicts of guilty as charged on both counts. On May 20, 2002, the trial court sentenced Jackson, as to Count 1, to life imprisonment at hard labor. As to Count 2, the court sentenced Jackson to forty-nine years at hard labor, ordering that both sentences be served without benefit of parole, probation, or suspension of sentence and that the sentences run concurrently to each other. Jackson appeals.

FACTS
Kenyatta Francis testified that, on January 24, 2001, he met with Quentin Wiley (a/k/a "Heat") to discuss the sale of one and one-quarter kilograms of cocaine he (Francis) had in his possession. Wiley told Francis that he knew someone who would buy the cocaine. Francis responded that he didn't want the buyer to know he was selling drugs, and that Wiley would have to "serve" him. That evening, Francis drove a Lexus sports utility vehicle (SUV) to the home of Wiley's girlfriend in the Woodmere Subdivision in Harvey. He was accompanied by a friend, Corey Charles, who was not involved in the planned transaction. Wiley joined the two men, and they set out to locate the buyer.
Following Wiley's directions, Francis drove to the Concordia Apartments on Westwood Drive in Marrero. Wiley exited the vehicle, carrying the cocaine in a plastic garbage bag. Wiley walked a short distance and met with a man Francis later identified as defendant, Damaris Jackson. Jackson and Wiley walked toward one of the apartment buildings and disappeared from view, while Francis and Charles waited in the SUV.
When Wiley failed to return, Francis placed a call to his cellular telephone. Francis' cellular telephone showed that the call was made at 7:11 p.m. He asked Wiley why the transaction was taking so long. Wiley told Francis that the buyer wanted to negotiate some changes in the original agreement. Francis exited the SUV, leaving Charles alone in the vehicle. Jackson approached Francis and told him he would take him to Wiley.
Francis and Jackson walked along the outside of one of the apartment buildings. At this time, Francis did not see Wiley. Francis observed that Jackson flinched nervously each time they passed a doorway. When Francis asked him where they were going, Jackson pointed a gun at him and said, "Give it up." Francis attempted to reach for the gun, but Jackson fired at him. A bullet went through his shoulder and hit his face, and he fell to the ground. Francis testified that Jackson did not take anything from him after he pulled out the gun. Jackson fled on foot, running toward the truck, and Francis heard two more gunshots. Although he did not see what happened, he assumed Jackson was firing at Corey Charles. He did not, however, have firsthand knowledge of who shot Charles. Francis did not see Wiley with a gun, and did not hear Wiley tell Jackson to shoot him.
*845 A nearby resident called police. Francis told an officer at the scene that Heat had set him up, and that Heat's real first name was Quentin. Francis was transported to West Jefferson General Hospital, where his injuries were treated. Francis testified that he did not recover the cocaine, nor did he receive any money. Francis also testified that he identified Wiley and Jackson from a photographic lineup. On cross-examination, Francis agreed that in his initial statement to police a week after the shooting, he did not mention that Jackson had told him to "give it up.
At trial, Deputy Theodore Keelen of the Jefferson Parish Sheriff's Office testified that he went to the 1500 block of Westwood Drive in response to a shooting call. He found Corey Charles lying on the ground, bleeding and gasping for air. He asked Charles what had happened. Charles told him that he was with a guy called Keyana [sic], and then Charles responded that he could not breathe any longer. Deputy Keelen and another officer performed cardiopulmonary resuscitation, and then turned the victim over to the care of emergency medical technicians. Charles was eventually pronounced dead at the scene. The position of bullet casings found at the scene along with Charles' location when found by police indicated a chase had taken place.
Detective Donald Clogher testified that he interviewed Francis after the shooting, and based on information given by him, Wiley was arrested. Subsequently he obtained an arrest warrant for Jackson. Between January 30, 2001 and February 5, 2001, Clogher conducted six tape-recorded interviews with Wiley. Portions of the statements were excised as agreed upon by attorneys, and the tape recordings were all played for the jury at trial. Transcripts of the statements were given to the jury. In the first interview, Wiley stated that he knew Kenyatta Francis, and that he knew who Corey Charles was. (In that first interview, Charles was referred to as "Corey Brown", whose nickname was "Rat".) Wiley denied having been on Westwood Drive on the night of January 24, 2001, insisting that he never goes to that area.
In his second statement taken approximately two hours later, Wiley said he went to 1500 Westwood Drive with Kenyatta Francis, who drove the Lexus truck, and Corey Charles, on January 24, 2001. He and Charles waited in the vehicle while Kenyatta went into an apartment to "holler at" someone about a "deal" he had worked out earlier. Wiley believed the deal involved a drug transaction. Francis called Wiley from his cell phone and told him to come in. Wiley continued to wait in the truck, and Francis exited the apartment some time later with two unknown men wearing hats. Francis was saying he would not give (the men) their money back, and as the men walked toward the vehicle, one of Francis' two companions shot him. Wiley did not know which of the men fired on Francis, but he saw them both holding guns. One had a silver gun, and the other a large, black semi-automatic handgun with a laser sight. Wiley jumped out of the truck and ran. Rat also jumped out. Wiley went to the Woodmere area, to the home of his girlfriend, Gretchen, and later left there in his Corvette.
Wiley made his third statement on February 1, 2001 at 11:35 a.m. This statement was substantially the same as the second, except that Wiley identified the shooter as "Marious," also known as "D." Wiley said Marious was the one who had the .9mm gun with a laser sight. He denied any involvement in a drug transaction.
Wiley's fourth interview took place on February 1, 2001 at 2:45 p.m. Wiley stated that he arranged for Kenyatta Francis and *846 the shooter "Demarious, [sic]" whose last name is either Smith or Jackson, to meet. Damarious wanted to buy a "quarter key" (i.e., kilogram) of cocaine, and Wiley contacted Francis. Wiley accompanied Francis to the Concordia Apartments to sell a quarter key to Damarious. When they arrived at the apartment complex, Wiley sent Francis to meet with Damarious. Francis went into an apartment. When he exited the apartment, shots were fired. Wiley saw Damarious and a second, unknown man. Throughout the incident, Wiley never saw the drugs.
Wiley made a fifth statement at 3:40 p.m. on February 1, 2001. He stated that he went with Francis and Rat to meet Damarious. They were in a Lexus truck and planned to sell a quarter key of cocaine to Damarious, as arranged by Wiley. Wiley jumped out of the truck with the cocaine which was packaged in a black bag. He met with Damarious inside of an apartment and gave him the cocaine. Francis called Wiley on his cellular telephone to ask if he was all right. Wiley told Francis that Damarious was not satisfied with the quality and price of the cocaine. Francis said he wanted to see Damarious to discuss the matter. Wiley stayed in the apartment while Damarious went outside, putting a .9 mm handgun in his jacket. A short time later, Wiley heard shooting. When he left the apartment, he saw Demarious with the .9 mm, with the red laser. Another unidentified man was outside. Wiley ran to a nearby wooded area and later that night, he learned that Francis had been shot.
Wiley made a sixth and final statement on February 5, 2001 at 7:09 p.m. Wiley said Damaris Jackson told him he wanted to buy a quarter key of cocaine. Wiley picked up Jackson, who had a gun obtained from Wiley, and left him at Woodmere. Jackson was to meet him at the Concordia Apartments, and later, Wiley went with Francis and Corey to the Concordia, purportedly to sell cocaine to Jackson. However, when Wiley exited the Lexus SUV with the cocaine, he did not meet with Jackson. Instead, he went to a Nissan Maxima he had parked nearby, and drove it to Woodmere. Wiley then left Woodmere in his Corvette. He took the cocaine with him and hid it. He did not see Jackson after the shootings. Although he changed his story several times during the statement, Wiley ultimately said that he and Jackson planned a "rip-off" before the meeting at the Concordia Apartments.
Jackson made seven separate tape recorded statements on February 2, 2001. He was questioned by Detective Clogher and Detective Donald Meunier. All of the statements, as altered by agreement of the attorneys, were played at trial, and transcripts of those statements were shown to the jurors. The first interview began at 5:02 p.m. Jackson told Detective Clogher that he lives with his girlfriend, Pamela Willis, at 6565 Benedict Street in Marrero. He spent most of the day with her, and later in the evening went to smoke some "weed" with his brother Jerell, a/a/a "Hoops." After about 30 minutes, Jackson returned home. He said he did not know Kenyatta Francis, and that he knew Corey Charles only as a friend of his brother's. Jackson told the detective that he did not go to Westwood Drive on the night of January 24, 2001, had not seen Corey that night, and had no direct knowledge of what had transpired.
Detective Clogher conducted a second tape recorded interview with Jackson at 5:37 p.m. There, Jackson said he heard a rumor that Wiley ("Heat") was seen leaving the scene of the shooting. He had seen Wiley the Saturday after the incident. A week after the shooting, Wiley contacted him through his (Wiley's) girlfriend. Wiley *847 wanted to know whether Jackson had heard anything about the shootings.
The third interview began at 6:35 p.m. According to this account, Jackson was riding a bicycle through the Concordia Apartments complex at the time of the shootings. He heard three shots, but he did not see the incident. Jackson saw a black truck pulling into the last driveway. He drove past the area later with his girlfriend, and they saw police.
Jackson's fourth interview began at 7:25 p.m. He stated that he was walking toward Westwood Drive on the night of January 24, 2001, when he saw a man who he later learned was Francis walking toward him. Addressing someone else, Francis said, "What's up dog?" He saw a black truck, with someone sitting inside of it. Jackson then heard gunfire, and ran. He did not see anyone else in the area, and did not see Quentin Wiley there.
Jackson's fifth statement began at 9:14 p.m. He said he was in the Concordia Apartments complex looking for his girlfriend's car, as she had allowed a man to borrow it. He saw Heat (Wiley), who said he had business in the area. Wiley asked Jackson to go around the corner and let Francis know that Wiley was there. Jackson went to give Francis the message from Wiley, and as he approached Francis, his (Jackson's) pants started to slide down. Jackson grabbed the gun that was tucked into his pants and started to put it in his jacket pocket. Francis tried to grab the gun, and it went off. Jackson shot Francis two to three times. Jackson then fled on foot. He saw someone jump out of Francis' truck and move toward him. Thinking that person had a gun, Jackson fired on him. Jackson stated that his gun is a .40 mm, and that it has a laser sight. He ran home and asked his girlfriend to take him to the St. Thomas Housing Project in New Orleans, where he sold his gun.
A sixth interview began at 10:04 p.m. Jackson said that, on January 24, 2001, Heat told him that he and Francis had some cocaine they were going to sell. Wiley told Jackson to meet him at the Concordia Apartments, and he would get a share of the cocaine. Jackson brought his gun to protect himself. When the two met that night, Wiley asked Jackson to go to Francis' truck and bring Francis to him. Jackson and Francis were walking together, and Francis flinched or jumped. In response, Jackson pulled out his gun and shot Francis. Corey Charles ran from Francis' truck, taking Jackson by surprise. Thinking Charles might have a gun, Jackson fired at him. Jackson did not see Wiley after the incident, and in this statement, declared that he sold his gun for two bags of heroin.
The seventh and final interview began at 10:54 p.m. Jackson stated that Wiley) came to his house on January 23, 2001. Wiley told him that he had a "little hustle" and offered Jackson six thousand dollars worth of cocaine to kill Francis. Jackson said he has a bad heroin habit, and Wiley knew he spent any money he got on the drug. Wiley used this to manipulate him.
On the morning of January 24, 2001, Wiley brought Jackson a gun, and brought him to Concordia earlier in the evening. Jackson then left in his girlfriend's car, and met Wiley at the Concordia Apartments later that evening. Wiley was carrying a bag. Wiley told Jackson to "go call that n____r for me." Jackson found Francis and told him to accompany him to where Wiley was. The plan called for Jackson to take Francis in back of a building and kill him.
As Jackson led Francis to the appointed spot, he tried to pull the gun from his jacket pocket, and found it was stuck. Francis saw this, and became jumpy. *848 Thinking that Francis might have a gun, Jackson fired his gun, shot Francis twice, and fled on foot. He saw someone in the truck and when Charles opened the door, Jackson shot him. Charles tried to run from Francis' vehicle as Jackson fired ten shots at him. Wiley saw Jackson running, and picked him up in a car and took him to his (Jackson's) girlfriend's house. Wiley gave him one hundred dollars that night. Jackson saw Wiley days later, at which time Wiley gave him an additional five hundred dollars. Wiley told Jackson he (Wiley) was wanted by the authorities, and that he planned to turn himself in.
Detective Clogher testified that the search of a residence where Jackson had been disclosed .9, .22, .25, and .32 caliber ammunition, but no .40 caliber rounds were found. No information was developed during the investigation to indicate that Wiley shot or robbed either Corey Charles or Francis, and neither the cocaine nor the gun used in the shooting was ever located.
Dr. Susan Garcia, an expert in forensic pathology, testified that she conducted an autopsy on the body of Corey Charles. She identified four bullet entrance wounds. Two of those wounds had corresponding exit wounds. As to the other two, the doctor recovered projectiles from the body. Two bullets entered from the back, and two from the right side. Three of the wounds were not lethal. The fourth bullet injured the victim's kidney, liver, and right lung. Dr. Garcia testified that organs bleed at a high rate. The liver is particularly vascular, and bleeds profusely when injured. It was the doctor's opinion that the victim bled to death. Dr. Garcia identified State's Exhibits 26 and 27 as the projectiles she removed from Corey Charles' body.
Louise Walzer, an expert in firearms identification and ballistics, examined the spent cartridge casings recovered from the scene and identified them as .40 caliber Speer casings. Walzer also examined State's Exhibits 26 and 27, the bullets recovered from the victim's body. She found that they were also .40 caliber. She testified that all of those items were consistent with being fired from a.40 caliber class weapon, and all of the fired cartridge casings came from the same weapon.
Detective Donald Meunier testified that he collected the evidence recovered from the crime scene, which included several .40 caliber cartridge casings. Investigating officers executed several search warrants in connection with the investigation. However, no gun was ever recovered. Among the items recovered in a search of 4232 Lac Couture Drive, Apartment C in Harvey, where defendant was believed to be staying, were numerous live .9 mm cartridges, as well as .22, .25 and .32 caliber cartridges.
Jackson's fiancée, Pamela Willis, testified on his behalf. She stated she was with Jackson during the entire day on January 24, 2001. She did not know of any conversation he may have had with Wiley. He used heroin on a daily basis, and that night he used heroin starting at around 6:00 p.m. He left her house that evening in her car. On the morning just prior to his arrest, he smoked marijuana.
Jackson concedes that he shot Kenyatta Francis and Corey Charles. He argues, however, that the state failed to prove a second degree murder in that it failed to produce sufficient evidence that he had the specific intent to kill or inflict great bodily harm as to Charles, or that he killed Charles while committing an armed robbery. Jackson further argues that the state failed to prove an attempted second degree murder, as it did not prove he had the specific intent to kill Francis.

*849 SUFFICIENCY OF EVIDENCE
When issues are raised on appeal as to sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine sufficiency of the evidence. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any issues regarding trial errors become moot.[2] For the foregoing reasons, we first address Jackson's second assignment of error.
The constitutional standard for testing the sufficiency of the evidence, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[3] When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.[4] When circumstantial evidence is used to prove a case, the trial judge must instruct the jury that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438.
On appeal, the reviewing court "does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events." State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020. Rather, the court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Id.[5]
To prove second degree murder, the state was required to show (1) the killing of a human being, and (2) that defendant had the specific intent to kill or inflict great bodily harm; or that defendant was engaged in the perpetration or attempted perpetration of an enumerated felony (i.e., armed robbery). LSA-R.S. 14:30.1. The trial court charged the jury as to the law regarding both felony murder and specific intent murder.
As to the murder of Corey Charles, from the evidence produced by the state, and from the prosecutors' closing arguments, the state apparently proceeded under both the theory of felony murder based on armed robbery or attempted armed robbery, and the theory of specific intent. Jackson argues the state did not produce sufficient evidence to prove second degree murder under either theory.
He urges that the state failed to prove he had the specific intent to kill or inflict great bodily harm, as required under LSA-R.S. 14:30.1 A(1). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Because specific intent is a state of mind, it need not be *850 proven as a fact, but may be inferred from the circumstances and actions of the accused, as well as the extent and severity of the victim's injuries.[6]
Jackson's seventh police statement provides direct evidence of specific intent. Jackson stated Wiley enlisted him to kill Francis in exchange for a share of Francis' cocaine. By his own account, Jackson went to the Concordia Apartments with the intention of carrying out that act.
Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person.[7] Jackson admitted to police that he fired ten shots at Corey Charles despite the fact that Charles was running away from him. Dr. Susan Garcia testified that the victim was hit four times, and that two of those shots were fired from behind.
Jackson asserts that various mental and emotional deficiencies made it impossible for him to formulate the specific intent to kill or inflict great bodily harm. However, the testimony of his expert witness refutes that claim. Dr. Sara Deland was accepted by the court as an expert in forensic psychiatry. She testified that Jackson has a long history of substance abuse, starting at age nine, and that heroin is now his drug of choice. In her opinion, he suffers from post traumatic stress disorder, stemming from the violent environment in which he was raised, and from several shootings which had occurred in his lifetime. He also suffers from polysubstance dependence. His I.Q. has consistently measured 74-75. After meeting with Jackson and studying his record, she was fairly certain that he has mental health problems that cause impaired judgment. Also, persons who use heroin chronically can function better day to day even when intoxicated than someone who uses it rarely; however, in general they do not think as clearly as everybody else. Nevertheless, she did not feel that Jackson was incapable of understanding the difference between right and wrong.
Dr. Deland testified that she reviewed Jackson's recorded statements, but that there was nothing in the statements that led her to believe Jackson was in a drug-induced stupor when he made them. She noted that he spoke of having been aware of at least some of the consequences of following through with the plan he and Wiley devised. Based on the foregoing, we find the evidence was sufficient to support a conviction for specific intent murder under Jackson v. Virginia.
To prove the attempted second degree murder of Kenyatta Francis, the state was required to establish that Jackson had specific intent to kill and that he committed an overt act in furtherance of that goal.[8] Jackson complains the evidence at trial does not support his conviction on Count 2, as it does not show he had the specific intent to kill Francis. In his brief, Jackson states, "While the original plan might have been to kill Francis, at the second he shot, Damaris Jackson was scared, thinking Francis was going for his own gun." Jackson admitted in his seventh recorded statement that he agreed to kill Francis for Wiley in exchange for cocaine. By his own admission, he accepted a gun from Wiley for the express purpose of committing the offense. On Wiley's *851 instruction, Jackson led Francis toward an area at the back of a building where he was to shoot Francis. Before they reached the designated spot, Jackson attempted to pull out his gun. The weapon became stuck in his jacket. To Jackson, it appeared that Francis was going to pull out a gun, and he panicked, shooting Francis.
The only evidence that Jackson may have acted in self-defense, or that he shot Francis accidentally, came from his own statement. It is apparent from these police statements that he intended all along to shoot Francis, and that circumstances simply led him to fire earlier than planned. Francis testified that, after shooting him, Jackson aimed the gun at his head, as if he were going to fire again. Francis fell to the ground before he could be shot a second time. There is no evidence that Francis was going to commit a forcible act against Jackson, and Francis testified that he did not have a gun. After shooting Francis, Jackson fled the scene, and did not seek help for Francis. Based on the foregoing, we find the state presented sufficient evidence to support Jackson's conviction for attempted murder. Jackson's claim that he had the specific intent to kill Francis until the moment he shot the victim has no merit.

MOTION TO SEVER AND ADMISSION OF CO-DEFENDANT'S STATEMENTS
Jackson also urges error in the trial court's rulings in failing to sever the trial of the defendants, in failing to deny the admission of the co-defendant's statements into evidence, and failing to grant the mistrial motion, which errors resulted in a violation of Jackson's Confrontation Clause rights.
Both Wiley and Jackson filed motions to suppress their confessions, which motions were denied. Jackson filed a Motion to Sever Parties, arguing he should receive a separate trial because, "his codefendants [sic] has a defense which is antagonistic to his." Jackson's counsel argued that he and Wiley should be tried separately, as he (Jackson) would be prejudiced by the admission of Wiley's recorded statements, and the admission of those statements would be a violation of the holding in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The trial court denied the severance motion.
La.C.Cr.P. art. 704 provides that jointly indicted defendants shall be tried jointly unless the state elects to try them separately, or the court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm, 446 So.2d 729, 741 (La.1984); State v. Foret, 96-281 (La.App. 5th Cir.11/14/96), 685 So.2d 210, 224. A defendant is not entitled to a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court. Prudholm, 446 So.2d at 741; State v. Cedrington, 98-253 (La.App. 5th Cir.12/16/98), 725 So.2d 565, 577, writs denied, 99-190 La.00-205 [(La.6/4/99)], 743 So.2d 1249 and 99-431 (La.6/25/99), 745 So.2d 1182. A denial of a motion to sever will not be overturned on appeal absent a clear abuse of discretion. Prudholm, 446 So.2d at 741; Cedrington, 725 So.2d at 577.
A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the state. Prudholm, 446 So.2d at 741; Cedrington, 725 So.2d at 577. The Defendant bears the burden of proof in *852 such a motion. Mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance. Prudholm, 446 So.2d at 741; Foret, 685 So.2d at 224. Furthermore, the fact that each defendant has pointed a finger at the other does not make defenses automatically antagonistic. Prejudice must be shown if defendants are to receive separate trials. State v. Williams, 416 So.2d 914, 916 (La.1982); Cedrington, 725 So.2d at 577.[9]
Under the antagonistic defenses test, a severance is required when each defendant intends to blame the other because a joint trial would require the defendants to defend not only against the State, but also against each other.[10] We note that in ordering severance of defendants, our Supreme Court has cautioned:
Prejudice may occur in a joint trial "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." Zafiro v. United States, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1933)[(1993)] (citing Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). The Supreme Court has not yet delineated those circumstances under which a codefendant's statement may be directly admissible against the defendant. It has made clear that such statements are presumptively unreliable to the extent that they incriminate the defendant. Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), and that they remain inadmissible at a joint trial even when the defendant has given his own "interlocking" statement. See Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) ("[W]here a nontestifying co-defendant's confession incriminating the defendant is not directly admissible against the defendant ... the Confrontation Clause bars its admission at their joint trial....").[11]
Jackson complains that the trial court deprived him of his Sixth Amendment right of confrontation by allowing the admission of inculpatory statements made by his co-defendant, Wiley, when he (Jackson) did not have the opportunity to cross-examine Wiley. The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination.[12]
On the second day of trial, out of the jury's presence, the attorneys representing Jackson and Wiley informed the court that their clients would not be testifying. Jackson's counsel stated that, if Wiley's police statements were admitted in evidence without his being given an opportunity to cross-examine Wiley, he would move for a mistrial.
By agreement of the parties, Wiley's and Jackson's statements were redacted to eliminate some potentially prejudicial material. Nothing was redacted from Wiley's first statement. Two pages were removed *853 from each of statements two and four. A sentence or phrase was removed from each of statements three, five, and six.
When the state offered the tapes and transcripts, the defense objected to their admission in evidence. The objections were overruled. At the conclusion of the state's case, both Jackson and Wiley informed the court they would assert their Fifth Amendment rights if they were called to testify. Wiley moved for a mistrial on grounds that Jackson had implicated him in his seventh statement, and that he would be deprived of his confrontation rights if he were not given the opportunity to cross-examine defendant. Jackson adopted Wiley's motion. The court denied a mistrial.
Confrontation errors are subject to a harmless error analysis.[13] Pretermitting a full discussion on the admissibility of Wiley's statements, we find that whether or not the admission of such was error, any possible error was harmless.
The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.[14]
Here, Wiley's statements were not necessary to the state's case. In light of the overwhelming evidence submitted by the state, including Jackson's own confession, we find the guilty verdict was surely unattributable to any possible error. Further, the defenses are not mutually antagonistic, as Jackson neither attempted to implicate Wiley as the shooter nor deny his own actions. Under these circumstances, a severance was not required, and there was no basis for a mistrial. This assignment of error is without merit.

ERROR PATENT
The record was reviewed for errors patent.[15] LSA-C.Cr.P. art. 930.8 provides that a defendant has two years from the date "the judgment of conviction and sentence become final" within which to file a post-conviction relief application. The article requires that the trial judge inform a defendant of the prescriptive period at the time of sentencing. In the instant case, the judge instructed Jackson that he would have "two years from today's date to file post conviction relief." (Emphasis supplied). We therefore order the trial court to supply Jackson with written notice of the prescriptive period under Article 930.8, and to file written proof of such notice in the record.[16]
For the foregoing reasons, the conviction is affirmed. The matter is remanded for purposes stated hereinabove.
*854 AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] See State v. Quentin Wiley, 03-KA-0884 (La. App. 5 Cir. 4/27/04), 880 So.2d 854, 2004 WL 895841.
[2] State v. George, 95-0110, p. 6 (La.10/16/95), 661 So.2d 975, 978; State v. Conner, 02-363, p. 7 (La.App. 5 Cir. 11/13/02), 833 So.2d 396, 401, writ denied, 02-3064 (La.4/25/03), 842 So.2d 396.
[3] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291; State v. Williams, 99-223 (La.App. 5 Cir. 6/30/99), 742 So.2d 604, 607.
[4] State v. Williams, supra.
[5] State v. Mitchell, 99-3342, p. 7 (La.10/17/00), 772 So.2d 78.
[6] State v. Keating, 00-51 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494.
[7] State v. Williams, 01-1650 (La.11/1/02), 831 So.2d 835, 849.
[8] LSA-R.S. 14:27, 14:30.1; State v. Zaldivas, 02-0690 (La.App. 5 Cir. 12/20/02), 836 So.2d 577, 580-581, writ denied, 03-0705 (La.10/17/03), 855 So.2d 757.
[9] State v. Quest, 00-205 (La.App. 5 Cir. 10/18/00), 772 So.2d 772, writ denied 00-3137 (La. 11/2/01), 800 So.2d 866.
[10] State v. Crowell, 1999-2238 (La.App. 4 Cir. 11/21/00), 773 So.2d 871, writ denied XXXX-XXXX (La.10/4/02), 826 So.2d 1112.
[11] State v. Johnson, 96-0959 (La.6/28/96), 675 So.2d 1098.
[12] Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Jones, 02-267, p. 4 (La.App. 5 Cir. 7/30/02), 824 So.2d 514, 516, writ denied, 02-2518 (La.6/27/03), 847 So.2d 1254.
[13] See State v. Williams, XXXX-XXXX (La.4/9/03), 844 So.2d 832; State v. Robinson, XXXX-XXXX (La.5/17/02), 817 So.2d 1131.
[14] State v. Robinson, supra.
[15] LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
[16] See, State v. Stelly, 98-578, p. 6 (La.App. 5 Cir. 12/16/98), 725 So.2d 562, 564.