*472
 
 SUSAN M. CHEHARDY, Judge.
 

 |2On April 13, 2007, the Jefferson Parish Grand Jury returned an indictment charging defendant, pursuant to La. R.S. 14:30.1, with second degree murder for the homicide of Florence White. Defendant was arraigned and pled not guilty. After a three-day trial that commenced on August 21, 2007, the twelve-member jury unanimously found defendant guilty as charged.
 

 On September 17, 2007, the trial judge denied defendant’s motion for new trial. During the same hearing, defendant waived sentencing delays, and the trial judge sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This timely appeal follows.
 

 FACTS
 

 After Hurricane Katrina, Milton Brown and Carlton Parks, along with many others, moved to the New Orleans area to obtain work repairing houses and other buildings that were damaged by the storm. In December of 2005, Milton Brown met Desmarie Johnson, a local nurse, and began dating. At Mr. Brown’s request, Ms. Johnson invited Brown’s co-worker and roommate, Carlton Parks, to spend New Year’s Eve with them.
 

 | ¡¡That night, Ms. Johnson also invited her sixty-one-year-old aunt, Florence White to spend the evening with them. That night, Mr. Parks, who was forty-four, was introduced to Mrs. White. Although Mrs. White might have been amenable to a romantic relationship with Mr. Parks, he was not interested in Mrs. White romantically.
 

 In February of 2006, Mr. Brown and Mr. Parks, who worked and lived together, lost their jobs and apartment. Ms. Johnson permitted Mr. Brown to stay at her home but refused to allow Mr. Parks to stay with her. Mr. Parks asked Mrs. White for a place to stay because he had “no one else.”
 

 Mrs. White allowed Parks to move into her house at 233 Capital Drive in Avon-dale, Louisiana. At first, Mr. Parks stayed in an unused bedroom on the first floor, but within a few weeks, he began spending more time in the FEMA trailer that was parked in front of Mrs. White’s house. Again, it is undisputed that Mrs. White and Parks were not involved romantically.
 

 On May 4, 2006, at 11:14 p.m., Mrs. White called her niece, Ms. Johnson. Mrs. White, who was crying, reported that Parks had threatened her. Ms. Johnson knew that Parks had a gun, which he had fired in Mrs. White’s house on two previous occasions, so she went to her aunt’s house.
 

 After Ms. Johnson and Mr. Brown arrived at White’s house at 11:45 p.m., they knocked on the front door and called for Mrs. White but she did not answer. While they were knocking, Mr. Parks opened the door of the FEMA trailer to ask what his friends were doing. When Ms. Johnson asked about her aunt, Mr. Parks volunteered that Mrs. White was in the house. When Ms. Johnson informed Mr. Parks that her aunt would not answer her door, Mr. Parks said that Mrs. White may have gone out for a walk. Mr. Parks then returned to the trailer, where he had a female guest, and closed the door.
 

 |4Ms. Johnson and Mr. Brown went around the house knocking and calling out to Mrs. White, but there was still no answer. Eventually, Ms. Johnson found a way into her aunt’s house. When Ms. Johnson entered the house, she found that the lights and television were on, and DVDs were scattered on the floor in the den.
 

 
 *473
 
 While searching the house, Ms. Johnson found her aunt lying on the floor of the living room, face down in a pool of blood with blood draining from her left ear. When Ms. Johnson checked her aunt’s vital signs, she noticed that Mrs. White’s body was “really warm” so Ms. Johnson tried to revive her to no avail. When Mrs. White did not respond, Mr. Brown called 911.
 

 Around this time, Mr. Parks entered the house. When Ms. Johnson confronted him, he said, “I didn’t do anything. You think I would do anything to Flo? She’s all I had.” Brown recalled that Park’s demeanor was “strange,” as he was not crying and showed no emotion. Mr. Brown subsequently saw Parks leave the house and go toward the backyard where a canal was located. Mr. Brown did not know why Mr. Parks went to the backyard.
 

 Dr. Susan Garcia, an expert forensic pathologist, performed the autopsy on Mrs. White. She testified that White sustained a tight-contact gunshot wound to the left ear canal that resulted in lethal injury to her brain. Dr. Garcia explained that the only way to sustain such a wound is for the gun barrel to be inserted into Mrs. White’s ear canal at the time of discharge.
 

 Dr. Garcia testified that she could not rule out suicide from a purely medical standpoint; however, after learning information found during the ensuing investigation, Dr. Garcia determined that the cause and manner of death was homicide. Dr. Garcia stated that Mrs. White’s wound was not consistent with someone struggling over a weapon.
 

 | ¡^Detective Jeffery Rodrigue of the Jefferson Parish Sheriffs Office (“JPSO”) testified that the sheriffs search of White’s residence uncovered the following items, among other things: one round of Winchester .38 caliber ammunition from the drawer of the nightstand in the bedroom on the first floor; Park’s Ochsner ID in the same bedroom, and two partial projectiles found lodged in the front door and the sofa. Further, the sheriffs search of the FEMA trailer revealed a black backpack, which contained a box of Winchester .38 special ammunition. Rodrigue and JPSO Detective Dave Morales testified that the gun used to shoot the victim was never found.
 

 Louise Walzer, a firearms expert, testified that the projectile recovered from the victim during the autopsy was .38 caliber ammunition. Her report indicated that a partial projectile recovered from the sofa was also .38 caliber ammunition. She further testified that the projectile and the partial projectile were consistent with having been fired from the same type of weapon, which included a Smith and Wesson Combat Masterpiece.
 

 At trial, local attorney Leopold Sher testified that, during December 2005 and January 2006, employees of Kennedy Construction, including Parks and Brown, repaired storm damage to his father’s apartment in New Orleans, which was also his boyhood home. He further testified that, when he got married in 1975 and moved out of that apartment, he left a yellow box of bullets and his .38 Smith and Wesson Combat Masterpiece revolver in a pouch in a dresser drawer in his bedroom. He identified the box of ammunition found in Park’s backpack as very similar to his box. In 2006, Sher looked for his weapon and box of bullets in the apartment, but could not find them.
 

 Milton Brown testified that he saw a handgun in a pouch in a dresser drawer while he was working at the elder Sher’s apartment. After he saw it, he told Parks Lab out it. Two days later, at their apart
 
 *474
 
 ment, Brown saw Parks remove that same gun and a yellow box from his backpack.
 

 Detective Morales testified that he took two statements from defendant after he waived his rights. During the first statement, defendant said that he borrowed Mrs. White’s car to pick up his friend, Julie Hamilton,
 
 [1]
 
 so they could watch movies in his trailer. When defendant got home, Mrs. White was standing outside of her house leaning against a car in the driveway. After defendant introduced Hamilton to White, he and Hamilton went into the trailer. He then went inside Mrs. White’s house to get the DVD player so that he and Hamilton could watch a movie. While they were watching the movie, Mrs. White knocked on the trailer door and asked to speak with Ms. Hamilton. Defendant refused, closed the door, and continued watching the movie.
 

 Defendant then stated that he heard someone knocking on White’s door about twenty minutes later. When he opened his door, he saw Ms. Johnson, who told him her aunt had called crying. Defendant closed the trailer door and finished watching the movie. About 10 minutes later, Mr. Brown came to the door to tell him that Mrs. White was lying on the floor in blood. Defendant left the trailer, went inside White’s house, felt her artery, and said, “She’s gone.” Mr. Brown then called 911.
 

 Defendant thought that White might have been jealous and angry because he used her car to pick Hamilton up so they could watch movies together. Defendant also kept saying, during this statement, that, although he knew that Mrs. White may have been interested in a romantic relationship with him, he had told her many times that he wanted to have kids of his own, which required a younger woman.
 

 17During the second statement, defendant changed his story. He said that he went back into Mrs. White’s house a second time to get a DVD. As he was about to go back outside, Mrs. White was standing in the living room facing him with her back to the door. Mrs. White had a gun in her hand and told him that she hated him and wanted him and Hamilton to leave. Mrs. White then put the gun to her head and pulled the trigger before defendant could stop her. After Mrs. White fell to the floor, defendant realized she was not breathing. He checked her carotid artery, grabbed the gun from the floor, and returned to his trailer. After entering his trailer, defendant immediately hid the gun so Ms. Hamilton would not see it.
 

 Defendant stated that the gun was his because he had found it. Wflien asked, defendant could not remember where or when he found the gun. He reported that Mrs. White was holding the gun for him because he had previously discharged the gun twice in her home. Defendant claimed that he had been drinking beer on the day of the earlier incident so he could not remember what happened. Defendant stated that, after Mrs. White recounted the incident, he was afraid to have the gun, so he asked Mrs. White to get rid of it for him.
 

 JPSO Sergeant Eddie Klein testified that he took a third statement from defendant. In the third statement, defendant changed his story again. He said that when he was preparing to leave Mrs. White’s house after getting the DVD, he saw her standing in the living room with a gun in her hand. Mrs. White told defendant that she wanted him and Hamilton to leave and that she was going to kill him. Mrs. White pointed the gun at him as defendant approached her, grabbed the
 
 *475
 
 gun, and tried to stick his thumb “between the hammer” to keep it from firing. However, the gun went off during the struggle, and a bullet struck Mrs. White, who fell to the ground. Defendant panicked, grabbed the gun, and went out the front door. He did not know what he did with the weapon.
 

 | ^Officers from the sheriffs office testified that, initially, the defendant’s right hand and the victim’s left hand tested positive for gunshot residue.
 
 [2]
 
 Morales testified that it was a mistake not to test defendant’s clothes for gunshot residue; however, he did not see anything on those clothes.
 

 Further testing, which is always performed in gunshot residue analysis, reflected that there was no gunshot residue on defendant’s right hand. The testing also revealed that the victim’s left hand had only single component particles, which is not consistent with firing a revolver at close proximity. The expert stated that, if a person shot herself in the head with her left hand, he would have expected to find more particles than he saw in this case.
 

 JPSO Captain Timothy Scanlan, an expert in firearms, toolmark identification, and bloodstain pattern analysis, testified that it was very common for a victim who has been shot to have gunshot residue on his or her hands. He also testified it would be common for a person who shoots a weapon and was tested five or six hours later (as defendant was) to not have gunshot residue on his or her hands. Scanlan stated that he would not expect a person who puts a gun in someone’s ear and discharges it to have a significant amount of blood or “back spatter” on him.
 

 The defense did not call any witnesses. After hearing the testimony and reviewing the physical evidence, the twelve-person jury found defendant guilty of second degree murder.
 

 On appeal, defendant raises two assignments of error: first, it was error for the trial judge to deny the defendant’s Motion in Limine which sought to exclude inadmissible hearsay, and second, it was error for the trial judge to deny the motion to suppress statements.
 

 |9In his first assignment of error, defendant argues that the trial court erred by denying his motion in limine to exclude statements the victim made to Desmarie Johnson over the telephone on the night of her death. He contends that those statements were inadmissible hearsay, which did not fall under any exception to the hearsay rule. He asserts that the “excited utterance” exception is inapplicable because there was no indication as to when defendant made those statements to the victim, and because the statements expanded beyond a description of events to include past facts. He also argues that the introduction of this evidence violated his federal and state right of confrontation.
 

 The State responds that the statements were non-hearsay and, therefore, admissible under La. C.E. art. 801 D(4).
 
 [3]
 
 The State also responds that the statements were admissible under the “excited utterance” and “present sense impression” exceptions to the hearsay rule. The State argues alternatively that, even if the state
 
 *476
 
 ments were erroneously admitted, any error was harmless.
 

 Defendant filed a pre-trial motion in li-mine asking the court to exclude statements the victim made to Johnson because such evidence was hearsay and it was more prejudicial than probative. At the hearing on the motion, defense counsel argued that the statements were inadmissible hearsay, and that they were not admissible under any exceptions to the hearsay rule. He argued that he had the right to cross-examine an individual who speaks hearsay, which was impossible in this case. The prosecutor responded that the statements were admissible under three exceptions to the hearsay rule: the “excited utterance” exception, the “state of mind” exception, and the “res gestae” exception. He explained that the victim’s call was an urgent call for help.
 

 | inDefense counsel argued that the court could not rule on the “excited utterance” exception because it was unclear how much time elapsed between the time defendant made the statements to the victim and the time the victim called her niece. The prosecutor responded that defendant made the statements immediately before the call, since the victim was crying during the phone call, defendant admitted to arriving at the house around 10:00 p.m., the call was made at 11:15 p.m., and the victim was found dead at 11:45 p.m. The trial judge commented that, even though the time frame could not be pinpointed exactly, the victim’s upset and urgent demeanor indicated that defendant’s statements to her occurred in close proximity to the call.
 

 After hearing arguments of counsel, the trial judge denied the motion in limine based on the State’s argument that the statements were primarily an “excited utterance” because of the victim’s demeanor at the time of the call. The trial judge also indicated that the statements fell under the “state of mind” exception to the hearsay rule. She explained that she was going to give defense counsel wide latitude in cross-examining Ms. Johnson regarding the statements the victim made to her to determine whether the victim might have had any other motive for making those statements.
 

 At trial, Ms. Johnson testified that, on May 4, 2006, at 11:14 p.m., Mrs. White called her on her cell phone. Mrs. White was crying and her voice was “very shaky.” Ms. Johnson believed that she was afraid. Mrs. White told Ms. Johnson that defendant “brought this woman to my house' — -in my house and you know, nobody’s going to treat me like that.” Mrs. White also told Mr. Johnson, “And he told me that if there is any sh*t in the house tonight that he had a gun.” Mrs. White also said with a sense of urgency in her voice, “Please, come and be with me. Come right now.” Afterwards, Mrs. White hung up the phone without | n saying goodbye. Ms. Johnson testified that Mrs. White was scared, and that she had never heard Mrs. White sound so upset.
 

 Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801 C. Hearsay evidence is not admissible except as otherwise specified in the Louisiana Code of Evidence or other legislation. La. C.E. art. 802.
 

 In the instant case, the trial judge found that the victim’s statement was admissible under the “state of mind” exception to the hearsay rule, which is one of the traditional hearsay exceptions to prove the state of mind of the declarant.
 
 State v. Leonard,
 
 05-42 (La.App. 5 Cir. 7/26/05), 910 So.2d 977,
 
 writ denied,
 
 06-2241 (La.6/1/07), 957 So.2d 165,
 
 citing State v.
 
 
 *477
 

 Brown,
 
 562 So.2d 868, 877 (La.1990). Whether the declaration is a direct assertion of the speaker’s state of mind (hearsay) or whether the declaration tends to indirectly establish the declarant’s state of mind (non-hearsay), the declaration is admissible under Louisiana jurisprudence if the declarant’s state of mind is at issue or is relevant to prove a fact at issue.
 
 Id.
 
 According to
 
 Brown,
 
 this tradition was formally adopted by the Louisiana Legislature in La. C.E. Art. 803(3), which provides in pertinent part:
 

 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 

 [[Image here]]
 

 3) Then existing mental, emotional, or physical condition. A statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant’s then existing condition or his future action
 

 Id.
 
 at 877.
 

 Conduct or declarations of the decedent shortly before his killing may sometimes be admissible as tending to show the immediately antecedent 1 ^circumstances explanatory of the killing and connecting the defendant with it.
 
 State v. Leonard,
 
 05-42 at 16, 910 So.2d at 987. However, hearsay evidence showing the victim’s state of mind for the purpose of proving the motive of the defendant is inadmissible, since its prejudicial effect on the defendant far outweighs its probative value as to the victim’s state of mind.
 
 Id.
 

 In
 
 State v. Raymond,
 
 245 So.2d 335, 258 La. 1 (1971),
 
 appeal dismissed, cert. denied,
 
 404 U.S. 805, 92 S.Ct. 101, 30 L.Ed.2d 38 (1971), quoted by
 
 State v. Leonard,
 
 the Louisiana Supreme Court held that, even if the victim’s statement several hours before his murder was hearsay, it was admissible as “state of mind” evidence or
 
 res
 
 gestae.
 
 [4]
 
 This Court in
 
 Leonard, supra,
 
 quoted the
 
 Raymond
 
 court’s explanation for this exception to the general hearsay rule:
 

 The need for this type of evidence in a homicide case is apparent. The victim is dead. In many instances, the jury must determine the facts from a mosaic of circumstantial evidence. This is true in the present case. We conclude that the statement was properly admitted in evidence.
 

 State v. Leonard,
 
 05-42 at 17, 910 So.2d at 988.
 

 In this case, we find that the victim’s statement was relevant to establish the victim’s immediate fear of defendant and her request for help from her niece. We find that the trial judge did not err by admitting the evidence under the
 
 res ges-tae
 
 hearsay exception.
 

 Next, defendant asserted at trial and on appeal that his right of confrontation was violated by the admission of the victim’s statement. The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him.
 
 State v. Jackson,
 
 03-883 (La.App. 5 Cir. 4/27/04), 880 So.2d 841, 852,
 
 writ denied,
 
 04-1399 (La.11/8/04), 885 So.2d 1118. Traditionally, for purposes of the Confrontation Clause, all hearsay
 
 *478
 
 statements were admissible if (1) the de-clarant was unavailable to testify, and (2) the statement fell under a “firmly rooted hearsay exception” or bore “particularized guarantees of trustworthiness.”
 
 State v. Smothers,
 
 05-781, p. 10 (La.App. 5 Cir. 3/28/06), 927 So.2d 484, 489,
 
 citing Ohio v. Roberts,
 
 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). However, the United States Supreme Court overruled
 
 Roberts
 
 insofar as it applies to out-of-court statements that are “testimonial” in nature in
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
 
 Id.
 

 The
 
 Crawford
 
 Court drew a distinction between testimonial and nontestimonial hearsay and noted that nontestimonial hearsay is admissible where both prongs of
 
 Roberts
 
 are satisfied, regardless of whether the defendant has had a prior opportunity to cross-examine the declarant.
 
 State v. Smothers,
 
 05-781 at 10, 927 So.2d at 489. The
 
 Crawford
 
 Court held that testimonial hearsay statements may be admitted as evidence at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant.
 
 State v. Smothers,
 
 05-781 at 10, 927 So.2d at 490.
 

 Thus, in the instant case, the first issue is whether the statement at issue was “testimonial.” While the Supreme Court specifically declined to define “testimonial,” it recognized that, at a minimum testimonial statements include: “prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and police interrogations.”
 
 State v. Leonard,
 
 05-42, p. 19 (La.App. 5 Cir. 7/26/05), 910 So.2d 977, 989,
 
 citing Crawford, supra,
 
 124 S.Ct. at 1374. The
 
 Crawford
 
 Court stated that “testimony” is “[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.”
 
 State v. Leonard,
 
 05-42 at 19-20, 910 So.2d at 989,
 
 citing Crawford, supra,
 
 124 S.Ct. at 1364. | ¶ 4 Accor ding to the Supreme Court, an accuser making a formal statement to government officials bears testimony in a sense that a person making a casual remark to an acquaintance does not.
 
 Id.
 
 As examples of testimonial statements, the
 
 Crawford
 
 Court lists affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements that declarants would reasonably expect to be used in a prosecution. The Supreme Court also refers to statements that were made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.
 
 State v. Leonard,
 
 05-42 at 20, 910 So.2d at 989-90
 
 citing Crawford, supra,
 
 124 S.Ct. at 1364.
 

 In
 
 Leonard, supra,
 
 the trial court permitted the victim’s girlfriend to testify that the victim told her that he was going to Memphis with defendant to buy marijuana. This Court found that the victim’s statements to his girlfriend were non-testimonial as they did not come within the purview of any of the classes of testimonial statements mentioned in
 
 Crawford. State v. Leonard,
 
 05-42 at 21, 910 So.2d at 990. This Court also stated that it failed to find that these statements, which were made in a private conversation, were made under circumstances in which an objective person would reasonably think that the statements would be available for use at a later trial.
 
 Id.
 

 Likewise, in
 
 State v. Heggar,
 
 39,915, p. 4 (La.App. 2 Cir. 8/17/05), 908 So.2d 1245, 1248, defendant challenged the trial court’s ruling on the motion in limine that allowed the State to present the testimony of a witness regarding the content of her conversations with the victim immediately pri- or to his murder. The Second Circuit found that the rule in
 
 Crawford
 
 was inap
 
 *479
 
 plicable because the statements were not testimonial in nature. The court noted that the victim was speaking to a friend, and not the police.
 
 Id.,
 
 39,915 at 7, 908 So.2d at 1249. The |1scourt also noted that the victim had no expectation that his statement would be of later use to accuse defendant of a crime, as he spoke informally and without coercion.
 
 Id.
 
 Additionally, the court found that, given the focus of
 
 Crawford
 
 on testimonial statements, the traditional foundation of reliability for the admissibility in a trial of hearsay under the exceptions was still viable so long as the declaration was not a testimonial statement.
 
 Id.,
 
 39,915 at 7, 908 So.2d at 1250.
 

 Similarly, in
 
 State v. Price,
 
 05-2514, p. 13 (La.App. 1 Cir. 12/28/06), 952 So.2d 112, 119,
 
 writ denied,
 
 07-0130 (La.2/22/08), 976 So.2d 1277, defendant argued that a witness’ testimony about his conversation with another witness moments before an automobile accident constituted impermissible hearsay and violated his right to confrontation under
 
 Crawford.
 
 The First Circuit found that the testimony was admissible under the present sense impression exception to the hearsay rule.
 
 Id.,
 
 05-2514 at 13, 952 So.2d at 120. Additionally, it found that
 
 Crawford
 
 was inapplicable, since the witness’ statements were not testimonial.
 
 Id.,
 
 05-2514 at 14, 952 So.2d at 121. The court noted that the witness was not speaking to the police, but to a friend; that she spoke informally and without coercion; and that the witness had no expectation that her statements would be of later use to help establish that defendant committed a crime.
 
 Id.,
 
 05-2514 at 14-15, 952 So.2d at 121. The court concluded, therefore, that the witness’ statements were not the sort that implicated the requirement of
 
 Crawford
 
 that prior “testimonial” statements be subject to cross-examination prior to admission.
 
 Id.,
 
 05-2514 at 15, 952 So.2d at 121.
 
 [5]
 

 hfiln this case, we find that the victim’s statements to her niece were non-testimonial. The statements do not come within the purview of any of the classes of testimonial statements mentioned in
 
 Crawford. Leonard, supra.
 
 The victim was speaking to a friend, and not the police.
 
 Heggar, supra; Price, supra.
 
 Additionally, the victim had no expectation that her statement would be of later use to help establish that defendant committed a crime, as she spoke informally and without coercion.
 
 Leonard, supra; Heggar, supra; Price, supra.
 

 However, a finding that a statement is “non-testimonial” for
 
 Crawford
 
 purposes does not end the inquiry. If “non-testimonial,” then the court must determine if the evidence meets the two-prong
 
 Roberts
 
 test of reliability.
 
 See State v. Leonard,
 
 05-42 at 21-22, 910 So.2d at 990-91. In the instant case, the first prong of the
 
 Roberts
 
 test is met because the victim, who died as a result of the homicide, was clearly unavailable. The second prong of the
 
 Roberts
 
 test is also met, since the victim’s statement falls into two firmly rooted hearsay exceptions, “state of mind” and “excited utterance,” which Louisiana has traditionally recognized as exceptions to the hearsay rule.
 
 See State v. Leonard,
 
 05-42 at 22, 910 So.2d at 991;
 
 State v.
 
 
 *480
 

 Henderson,
 
 362 So.2d at 1362.
 
 [6]
 
 We, therefore, find no error in the trial court’s ruling on defendant’s motion in limine.
 
 [7]
 

 In his second assignment of error, defendant argues that the trial court should have suppressed his statements because they were the fruits of an unlawful arrest. He contends that he was, in effect, unlawfully arrested without probable cause when the detectives transported him to the investigation bureau for an interview. Defendant claims that the detectives indicated an unmistakable intent to impose a restriction on his liberty more extensive than a mere communication or 117investigatory stop. He does not, however, contend that he was not advised of or failed to understand his rights.
 

 The State responds that defendant is precluded from raising this claim on appeal because he did not raise it either in his written motion to suppress or at the suppression hearing. With regard to the voluntariness of defendant’s statements and the grounds raised in his written motion and at the suppression hearing, the State argues that defendant’s statements were free and voluntary and made pursuant to a valid and voluntary waiver of Miranda
 
 [8]
 
 rights by defendant.
 

 Defendant filed a written motion to suppress confession arguing that the inculpa-tory statements and/or confessions were obtained unlawfully and illegally because:
 

 They were not made to police officers or to anyone else freely and voluntarily, but were made under the influence of fear, intimidation, threats or other duress, or because of promises or other inducements; and/or
 

 Defendant had not been advised of his rights under
 
 Miranda,
 
 or had invoked his right to remain silent or to have an attorney and this right had not been honored.
 

 At the suppression hearing, JPSO Detective Dave Morales and Sergeant Eddie Klein testified regarding the circumstances surrounding the taking of statements from defendant. Their testimony at the suppression hearing was similar to their trial testimony. After the State and the defense submitted the matter without argument, the trial judge denied the motion.
 

 After reviewing the record, we agree that defendant did not argue either in his written motion to suppress or at the suppression hearing that the statements were inadmissible as fruits of an unlawful arrest. As a result, the record does not disclose any evidence of the circumstances preceding defendant’s arrival at the detective bureau. Therefore, any question as to the illegality of defendant’s arrest 11sis not properly before this Court.
 
 State v. Smith,
 
 94-120, p. 6 (La.App. 5 Cir. 5/31/94), 638 So.2d 452, 455;
 
 State v. Barton,
 
 02-163, p. 13 (La.App. 5 Cir. 9/30/03), 857 So.2d 1189, 1199,
 
 writ denied,
 
 03-3012 (La.2/20/04), 866 So.2d 817.
 

 We will, however, review defendant’s claim that the statements were not freely or voluntarily made. Before an in-culpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a
 
 *481
 
 reasonable doubt that the defendant was first advised of his
 
 Miranda
 
 rights, that he voluntarily and intelligently waived his
 
 Miranda
 
 rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducements or promises.
 
 State v. Franklin,
 
 03-287, p. 4 (La.App. 5 Cir. 9/16/03), 858 So.2d 68, 70,
 
 writ denied,
 
 03-3062 (La.3/12/04), 869 So.2d 817.
 

 The admissibility of a confession or statement is a determination for the trial judge and his conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence.
 
 State v. Franklin,
 
 03-287 at 4, 858 So.2d at 70. In reviewing the trial court’s ruling, the evidence presented at trial may be considered in addition to the evidence presented at the hearing on the motion to suppress.
 
 Id.
 

 As was stated previously, defendant does not contend on appeal that he was not advised of or failed to understand his rights. In fact, the record shows that, when Detective Morales started to advise defendant of his rights, defendant informed the detective that he had been a police officer in Atlanta and, therefore, knew his rights and did not have to be advised of them. Nevertheless, Detective Morales advised defendant of his rights, and defendant signed the rights of arres-tee |19form indicating that he was advised of, understood, and agreed to waive his rights and give a statement. Defendant also acknowledged that he had been advised of his rights before he gave his second and third statements. Additionally, Detective Morales testified that he did not coerce or force defendant to give a statement.
 

 We reiterate that the trial court’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence.
 
 Franklin, supra.
 
 Upon review, we find that the trial judge’s ruling was supported by the evidence and should not be overturned.
 

 Finally, defendant requests an error patent review. As per our routine practice even without request from either party, this Court routinely reviews the record in criminal matters for errors patent in accordance with La.C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975); and
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals one error patent that requires corrective action.
 

 Here, the trial judge failed to advise defendant of the two-year prescriptive period for applying for post-conviction relief under La.C.Cr.P. art. 930.8, which provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 or 922. We, therefore, remand this matter to the trial court with instructions: first, inform defendant of the prescriptive period, set forth by La.C.Cr.P. art. 930.8, by sending written notice to defendant within ten days of the rendition of this opinion and, second, file written proof in the district court record that defendant has been given such notice.
 
 State v. Fazande,
 
 05-901, p. 10 (La.App. 5 Cir. 3/28/06), 927 So.2d 507, 513-14.
 

 UAFFIRMED; REMANDED WITH INSTRUCTIONS.
 

 [1]
 

 . Ms. Hamilton died of natural causes before defendant’s trial.
 

 [2]
 

 . Desmane Johnson testified that her aunt, Florence White, was right-handed.
 

 [3]
 

 . La. C.E. art. 801D(4) provides that a statement is not hearsay if "... the statements are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events, and which are necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.”
 

 [4]
 

 . The
 
 Leonard
 
 Court noted that, although
 
 Raymond
 
 and some of the other cases cited herein were prior to the effective date of the Code of Evidence in 1989, it found that this jurisprudence was still applicable to interpret the state of mind exception.
 
 State v. Leonard,
 
 05-42 at 16, 910 So.2d at 987.
 

 [5]
 

 . ((See
 
 also State v. Short,
 
 06-1451, pp. 6-7 (La.App. 3 Cir. 5/16/07), 958 So.2d 93, 97,
 
 writ denied,
 
 07-1646 (La.2/1/08), 976 So.2d 715 (statements made were non-testimonial and their admission did not violate the ruling in
 
 Crawford, citing State
 
 v.
 
 Miller,
 
 95 Conn. App. 362, 896 A.2d 844 (2006), "the statements at issue are the sort of remarks to an acquaintance that the
 
 Crawford
 
 [CJourt proclaimed to be non-testimonial,” and "[t]he courts of this land, both federal and state, are in agreement that statements made to friends in unofficial settings do not constitute testimonial hearsay.”)) A Petition for Certiorari was filed in the U.S. Supreme Court in
 
 Short
 
 on June 12, 2008. (No. 07-11448).
 

 [6]
 

 .
 
 See also State v. Robinson,
 
 00-2284 (La.1/12/01), 776 So.2d 431, 432 (per curiam) (called into doubt on other grounds by
 
 Crawford v.
 
 Washington) (“Excited utterance” is a firmly rooted hearsay exception).
 

 [7]
 

 . Even if the trial court’s ruling had been in error, this Court has recognized that a violation of a defendant's right to confrontation is subject to a harmless error analysis.
 
 State v. Leonard,
 
 05-42 at 22, 910 So.2d at 991.
 

 [8]
 

 . Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).